(No. 54752.—

CONSOLIDATION COAL COMPANY, Appellee, v. BUCYRUS-ERIE COMPANY, Appellant.

*Opinion filed February 2, 1982.*

104

SIMON, J., took no part.

Lord, Bissell & Brook, of Chicago (Richard E. Mueller and Hugh C. Griffin, of counsel), for appellant.

Sidley & Austin, of Chicago (Robert A. Downing and Arlene C. Erlebacher, of counsel) and Robins, Zelle, Larson & Kaplan, of Minneapolis (Lawrence Zelle and James D. Steiner, of counsel), for appellee.

JUSTICE UNDERWOOD delivered the opinion of the court:

Plaintiff, Consolidation Coal Company (Consolidation), brought this action in the circuit court of Cook County on January 18, 1977, to recover damages allegedly sustained on August 7, 1973, when its wheel excavator collapsed at its Pinckneyville, Illinois, coal mine. The excavator was designed, manufactured and repaired for Consolidation by defendant, Bucyrus-Erie (B-E), a Delaware corporation, licensed to do business in Illinois with its principal place of business and corporate headquarters in Wisconsin. Its attorneys are licensed to practice law in Illinois and Wisconsin. During the course of pretrial discovery, B-E refused to comply with the trial court's orders, and its attorney was held in contempt of court and fined $50. The appellate court affirmed the discovery rulings with some modification (93 Ill. App. 3d 35), and we allowed B-E's petition for leave to appeal to consider the scope of the attorney-client and work-product privileges in Illinois.

Consolidation commenced discovery in May of 1977 by filing a production request for all of B-E's documents relating to the design, manufacture, erection, and repair of the wheel excavator and all documents relating to the in-

vestigation of the excavator's collapse or otherwise relating to the facts in controversy, including memoranda, notes, correspondence, reports, statements, interviews, photographs, slides, films, recordings, tapes, micrographs, and metallurgical test data. B-E produced thousands of documents for inspection, but, invoking the attorney-client and work-product privileges, refused to produce a "metallurgical report" prepared by its employee, Richard Sailors, a report prepared by Tom Learmont, its director of engineering and mining machinery, and memoranda and notes of interviews with various B-E employees prepared by its in-house counsel. Following several hearings pursuant to Consolidation's motion to compel compliance, extensive briefings by the parties and an *in camera* inspection of the contested documents, the trial court ordered B-E to provide all of the documents in question, with the exception of certain deleted portions which it ruled constituted "work product" and the "Learmont Report," which the court ruled was exempt from discovery under the attorney-client privilege. No question is now raised regarding the trial court's ruling on the privileged status of the "Learmont Report."

The appellate court considered the attorney-client privilege inapplicable because there was no allegation by B-E that the disputed documents were received from members of B-E's "control group." It further held that neither Sailors' metallurgical report nor the bulk of B-E's attorney's notes constituted work product. It found that Sailors' report contains objective and material information that does not reflect or disclose B-E's attorneys' mental impressions, theories or litigation plans and modified the trial court's order to the extent that no deletions were necessary. Similarly, the court found that the attorneys' notes, with minor exceptions, contain factual information submitted by B-E's employees and do not reveal the attorneys' mental processes in shaping litigation strategy.

In both the trial and appellate courts, B-E argued that the law of Wisconsin should govern the scope of the attorney-client and work-product privileges. The appellate court followed the "most significant relationship test" of the Restatement (Second) of Conflicts of Laws, section 139 (1971), and affirmed the trial court, holding that the Illinois policy favoring discoverability was not outweighed by Wisconsin's contrary approach and Illinois law would therefore apply. B-E has apparently abandoned the conflicts issue in this court, since the question was neither raised in its petition for leave to appeal nor argued in its supplemental brief. Although B-E asserts that the documents are privileged under either Wisconsin or Illinois law, and its brief contains a citation of Wisconsin authorities supporting this proposition, its brief contains no discussion, argument or authority concerning the applicable law. Thus, if the conflicts issue has not been abandoned, it has been waived. (73 Ill. 2d R. 341(e).) We thus proceed to consider the privilege claims under Illinois law. B-E contends that the attorneys' notes and memoranda and Sailors' metallurgical report are protected under both the work-product doctrine and the attorney-client privilege.

The work-product doctrine in Illinois, which protects against disclosure of "the theories, mental impressions, or litigation plans of [a] party's attorney" (73 Ill. 2d R. 201(b)(2)), is believed necessary to prevent complete invasion of counsel's files. (*Monier v. Chamberlain* (1966), 35 Ill. 2d 351, 359; *Stimpert v. Abdnour* (1962), 24 Ill. 2d 26, 31.) In the Federal courts, this material, generally referred to by commentators as "opinion" work-product (see, *e.g.,* Comment, *Discovery and the Work Product Doctrine,* 11 Loy. Chi. L.J. 863, 873 (1980)), is discoverable, if at all, only under "rare" circumstances (*Hickman v. Taylor* (1947), 329 U.S. 495, 513-14, 91 L. Ed. 451, 463-64, 67 S. Ct. 385, 394-95; see also *Upjohn Co. v. United States* (1981), 449 U.S. 383, 399-400, 66

L. Ed. 2d 584, 597-98, 101 S. Ct. 677, 687-88; *United States v. Nobles* (1975), 422 U.S. 225, 244-45, 45 L. Ed. 2d 141, 157, 95 S. Ct. 2160, 2173 (White, J., concurring)), because it is thought that requiring disclosure of an attorney's strategies, legal theories and mental impressions would result in inefficiency, unfairness and sharp practices which would ultimately have a "demoralizing" effect on the legal profession (*Hickman v. Taylor* (1947), 329 U.S. 495, 511, 91 L. Ed. 451, 462, 67 S. Ct. 385, 394).

In *Monier*, we distinguished between memoranda made by counsel of his impression of a prospective witness and verbatim statements of such witness in an attempt to clarify the work-product doctrine in Illinois. We consider today whether counsel's notes and memoranda of employees or witnesses' oral statements which are not verbatim and are not reviewed, altered, corrected, or signed by these individuals are protected work-product. While our rule differs significantly from the more broadly protective Federal rule (see generally Johnston, *Discovery in Illinois and Federal Courts*, 2 J. Mar. J. Prac. & Proc. 22 (1968)), we agree with the Supreme Court that notes regarding oral statements of witnesses, whether in the form of attorney's mental impressions or memoranda, necessarily reveal in varying degrees the attorney's mental processes in evaluating the communications. See *Upjohn Co. v. United States* (1981), 449 U.S. 383, 399-400, 66 L. Ed. 2d 584, 597-98, 101 S. Ct. 677, 687-88, citing *Hickman v. Taylor* (1947), 329 U.S. 495, 91 L. Ed. 451, 67 S. Ct. 385 ("what he saw fit to write down regarding witnesses' remarks"; "the statement would be his [the attorney's] language, permeated with his inferences"); see also *In re Grand Jury Investigation* (E.D. Pa. 1976), 412 F. Supp. 943, 949 (notes of conversation with witnesses "are so much a product of the lawyer's thinking and so little probative of the witnesses' actual words").

Some of the disputed documents prepared by B-E's attorneys in this case are handwritten; others are typewritten in the form of memoranda. In our *in camera* inspection, it was evident that the typewritten documents, which were reduced to succinct and concise form, represent the attorneys' efforts in reviewing, analyzing and summarizing the portion of the communications with potential witnesses which the attorneys believed important in developing their theories of their client's cause. As such, they necessarily " 'reveal the shaping process by which the attorney[s] [have] arranged the available evidence for use in trial as dictated by [their] training and experience' " (*Monier v. Chamberlain* (1966), 35 Ill. 2d 351, 359) and are therefore entitled to protection. The handwritten notes represent a mixture of factual material and counsel's work product in the form of his conclusions, characterizations and summaries. Concededly, some of the factual material may be relevant to the issues. In many instances, however, this material is so inextricably intertwined with the privileged material that its isolation is virtually impossible. To impose upon the trial bench of this State the burden of reviewing voluminous material of this character would be totally incompatible with the efficient disposition of litigation. Moreover, and more importantly perhaps, such a procedure would violate the spirit of *Monier* and our discovery procedures which contemplate that discovery generally proceed without judicial intervention. (*Williams v. A. E. Staley Manufacturing Co.* (1981), 83 Ill. 2d 559, 564.) It would only serve to "increase the burden of already crowded court calendars, and thwart the efficient and expeditious administration of justice" which *Monier* sought to prevent. (*Monier v. Chamberlain* (1966), 35 Ill. 2d 351, 357.) Accordingly we hold that attorneys' notes and memoranda of oral conversations with witnesses or employees are not routinely discoverable. However,

because of the possibility that such notes and memoranda may, on rare occasions, constitute the only source of factual material, we believe that an exception must be made from the absolute work-product exemption. We are cognizant of the difficulty and conflict which may arise in applying any exception, which, of course, led us to reject the Federal good-cause doctrine in *Monier.* Nonetheless, we believe that a narrowly limited exception must be made and defined to permit access to such material in those rare instances. Since the exception will rarely be operable, conflicts should be minimal. We therefore hold that the attorney's notes or memoranda are discoverable only if the party seeking disclosure conclusively demonstrates the absolute impossibility of securing similar information from other sources.

There is nothing in this record to indicate any necessity that would lead us to hold the exception applicable here. Indeed, according to the affidavit of one of Consolidation's attorneys, B-E has made available for inspection "engineering records, design calculations, material specifications, correspondence and notes estimated to include tens of thousands of individual documents." In short, there is nothing which indicates that Consolidation does not already have or cannot obtain through its attorneys' efforts and depositions the same factual information that is now included in the form of B-E's attorneys' work product.

We do not believe, however, that Sailors' metallurgical report can fairly be characterized as B-E's attorney's work product. As the appellate court noted, the report is actually a notebook that contains objective and material information consisting of mathematical computations, formulae, tables, drawings, photographs, industry specification data, and handwritten notes. It does not reflect or disclose the theories, mental impressions or litigation plans of B-E's attorneys. Nor is it the product of the

attorneys' mental processes. Sailors never communicated with the legal department prior to preparing this material, nor was he advised by his superior, who had requested Sailors' help, as to what the theories or plans of the attorneys were relative to this litigation. He was simply asked to analyze pieces of the machinery and render an opinion as to what had occurred. When his report was transferred to the legal department some six months to a year after it had been made, it did not, as B-E argues, thereby become part of the attorneys' thought processes. It is therefore not entitled to protection under the work-product doctrine. (See generally Johnston, *Discovery in Illinois and Federal Courts,* 2 J. Mar. J. Prac. & Proc. 22, 48-51 (1968) (examining the possibility that an expert's report may constitute work product as defined in *Monier*).) Nor is it, in our judgment, exempt from discovery under the attorney-client privilege.

The question of who speaks for a corporation on a privileged basis has created considerable confusion and conflict in the Federal system and has frequently been the subject of law review commentaries. (*E.g.,* Burnham, *Confidentiality and the Corporate Lawyer: The Attorney-Client Privilege and "Work Product" in Illinois,* 56 Ill. B.J. 542 (1968); Weinschel, *Corporate Employee Interviews and the Attorney-Client Privilege,* 12 B.C. Ind. & Comm. L. Rev. 873 (1970); Note, *Attorney-Client Privilege for Corporate Clients: The Control Group Test,* 84 Harv. L. Rev. 424 (1970); Note, *Upjohn Co. v. United States: Death Knell for the Control Group Test and a Plea for a Policy-Oriented Standard to Corporate Discovery,* 31 Syracuse L. Rev. 1043 (1980).) B-E urges that we abandon the "control group" test first adopted in Illinois by the appellate court in *Day v. Illinois Power Co.* (1964), 50 Ill. App. 2d 52, as a means of defining "client" in the corporate context. (See also *Johnson v. Frontier Ford, Inc.* (1979), 68 Ill. App. 3d 315, 319; *Shere v.*

*Marshall Field & Co.* (1974), 26 Ill. App. 3d 728, 731-32; *Golminas v. Teitelbaum Construction Co.* (1969), 112 Ill. App. 2d 445, 449.) This test was recently rejected by the Supreme Court as the governing test in the Federal courts. *Upjohn Co. v. United States* (1981), 449 U.S. 383, 66 L. Ed. 2d 584, 101 S. Ct. 677.

In *Cox v. Yellow Cab Co.* (1975), 61 Ill. 2d 416, this court indicated that there are many factors relevant to a determination whether a statement given by a corporate employee is protected by the attorney-client privilege, including "the purpose for which the statement was required, the understanding by its maker as to that purpose, the extent to which its confidentiality was maintained after it was made and in the course of its transmission to counsel, and others." (61 Ill. 2d 416, 420.) While listing some of the requirements essential to assertion of the privilege, the court declined to articulate a particular test and expressed no opinion on the appellate court's application of the control-group test since there were insufficient facts in the record from which the existence of the privilege could be ascertained.

In the Federal system prior to *Upjohn,* three major tests had emerged. The most widely adopted control-group test was first announced in *City of Philadelphia v. Westinghouse Electric Corp.* (E.D. Pa. 1962), 210 F. Supp. 483, *petition for writ of mandamus or prohibition denied sub nom. General Electric Co. v. Kirkpatrick* (3d Cir. 1962), 312 F.2d 742, *cert. denied* (1963), 372 U.S. 943, 9 L. Ed. 2d 969, 83 S. Ct. 937, at a time when one Federal court had held that the attorney-client privilege was not available to corporations (*Radiant Burners, Inc. v. American Gas Association* (N.D. Ill. 1962), 207 F. Supp. 771, *aff'd on reconsideration* (N.D. Ill. 1962), 209 F. Supp. 321, *rev'd* (7th Cir. 1963) (*en banc*), 320 F.2d 314, *cert. denied* (1963), 375 U.S. 929, 11 L. Ed. 2d 262, 84 S. Ct. 330).

This test focuses on the status of the employee within the corporate hierarchy:

> "[I] f the employee making the communication, of whatever rank he may be, is in a position to control or even to take a substantial part in a decision about any action which the corporation may take upon the advice of the attorney, or if he is an authorized member of a body or group which has that authority, then, in effect, he is (or personifies) the corporation when he makes his disclosure to the lawyer and the privilege would apply. In all other cases the employee would be merely giving information to the lawyer to enable the latter to advise those in the corporation having the authority to act or refrain from acting on the advice."

(*City of Philadelphia v. Westinghouse Electric Corp.* (E.D. Pa. 1962), 210 F. Supp. 483, 485.) This approach was subsequently followed by the Third, Sixth and Tenth Circuits (*In re Grand Jury Investigation* (3d Cir. 1979), 599 F.2d 1224; *United States v. Upjohn Co.* (6th Cir. 1979), 600 F.2d 1223, *rev'd* (1981), 449 U.S. 383, 66 L. Ed. 2d 584, 101 S. Ct. 677; *Natta v. Hogan* (10th Cir. 1968), 392 F.2d 686), as well as several district courts outside those circuits (*e.g., Virginia Electric & Power Co. v. Sun Shipbuilding & Dry Dock Co.* (E.D. Va. 1975), 68 F.R.D. 397; *Burlington Industries v. Exxon Corp.* (D. Md. 1974), 65 F.R.D. 26; *Garrison v. General Motors Corp.* (S.D. Cal. 1963), 213 F. Supp. 515; see also Annot., 9 A.L.R. Fed. 685 (1971).) In addition, several States have incorporated this test in their rules of evidence. See Stern, *Attorney-Client Privilege: Supreme Court Repudiates the Control Group Test*, 67 A.B.A.J. 1142, 1144 n.4 (1981).

The Seventh Circuit, in *Harper & Row Publishers, Inc. v. Decker* (7th Cir. 1970), 423 F.2d 487, *aff'd by an equally divided court* (1971), 400 U.S. 348, 27 L. Ed. 2d

433, 91 S. Ct. 479, adopted a broader approach for determining when a corporation could claim the attorney-client privilege. The *Harper & Row* test, sometimes referred to as the "subject matter" or "scope of employment" test, is said to focus on why an attorney was consulted rather than with whom he communicated. (See *Diversified Industries, Inc. v. Meredith* (8th Cir. 1977), 572 F.2d 596, 609; see also Note, *Attorney-Client Privilege-Under the Newly Adopted Weinstein Subject Matter Test* (1979), 28 Drake L. Rev. 191.) Under the *Harper & Row* test, "an employee of a corporation, though not a member of its control group, is sufficiently identified with the corporation so that his communication to the corporation's attorney is privileged where the employee makes the communication at the direction of his superiors in the corporation and where the subject matter upon which the attorney's advice is sought by the corporation and dealt with in the communication is the performance by the employee of the duties of his employment." 423 F.2d 487, 491-92. See also *Hasso v. Retail Credit Co.* (E.D. Pa. 1973), 58 F.R.D. 425; *cf. Duplan Corp. v. Deering Milliken, Inc.* (D.S.C. 1974), 397 F. Supp. 1146 (approach combining both *Harper & Row* and an expanded control-group test).

Finally, the Eighth Circuit, in *Diversified Industries, Inc. v. Meredith* (8th Cir. 1977) (*en banc*), 572 F.2d 596, responding to one of the criticisms of the subject matter test—that a corporation could protect much information by simply directing all their employees to channel business reports to corporate attorneys—announced a modified version of the *Harper & Row* test:

"[T] he attorney-client privilege is applicable to an employee's communication if (1) the communication was made for the purpose of securing legal advice; (2) the employee making the communication did so at the direction of his corporate superior; (3) the superior made the request so that the

corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents." (572 F.2d 596, 609.)

Under this modified subject matter approach, any communication in which the employee functioned merely as a "fortuitous" or "bystander" witness would not be privileged. The *Harper & Row* court had implicitly recognized this same limitation.

All of the above tests have been criticized and additional tests have been proposed. (*E.g., D.I. Chadbourne, Inc. v. Superior Court* (1964), 60 Cal. 2d 723, 388 P.2d 700, 36 Cal. Rptr. 468 (11 "basic principles" should be considered); *In re Ampicillin Antitrust Litigation* (D.D.C. 1978), 81 F.R.D. 377, 387 (neither control-group nor *Harper & Row* test is sufficient; focus should be subject matter of communication and context in which it is made); *Duplan Corp. v. Deering Milliken, Inc.* (D.S.C. 1974), 397 F. Supp. 1146 (subject matter test a necessary corollary of control-group test; scope of control-group test expanded); *United States v. United Shoe Machinery Corp.* (D. Mass. 1950), 89 F. Supp. 357 (unlimited approach—all communications furnished to the attorney "by an officer or employee" of the corporation in confidence are privileged); Simon, *The Attorney-Client Privilege as Applied to Corporations,* 65 Yale L.J. 953 (1956) (test classifying corporate employees as "managing agents," "communicating agents," and "source agents"); Note, *Evidence—Privileged Communications—The Attorney-Client Privilege in the Corporate Setting: A Suggested Approach,* 69 Mich. L. Rev. 360 (1970) ("natural or appropriate person" approach); Comment, *The Privileged Few: The Attorney-Client Privilege as Applied to*

*Corporations,* 20 U.C.L.A. L. Rev. 288 (1972) (an expanded control-group test—communications of employee privileged if he had the ability to direct or take substantial part in directing corporation's *business* policy).) The broader tests have been criticized as shielding too much relevant information from discovery, whereas the principal criticism of the control-group test is that it frustrates the purpose of the attorney-client privilege by failing to take into account modern "corporate realities." (See *Upjohn Co. v. United States* (1981), 449 U.S. 383, 66 L. Ed. 2d 584, 101 S. Ct. 677, *Diversified Industries, Inc. v. Meredith* (8th Cir. 1978) (*en banc*), 572 F.2d 596.) While the Supreme Court rejected this test as inadequate, it declined to articulate an alternative standard to govern future cases in the Federal courts.

Whether a narrow or broad test should prevail depends, it seems to us, on the value to be accorded the two competing policies. As Justice Cardozo once remarked concerning the attorney-client privilege in another context:

"[T]he recognition of a privilege does not mean that it is without conditions or exceptions. The social policy that will prevail in many situations may run foul in others of a different social policy, competing for supremacy. It is then the function of a court to mediate between them, assigning, so far as possible, a proper value to each, and summoning to its aid all the distinctions and analogies that are the tools of the judicial process. The function is the more essential where a privilege has its origin in inveterate but vague tradition, and where no attempt has been made either in treatise or in decisions to chart its limits with precision." *Clark v. United States* (1933), 289 U.S. 1, 13, 77 L. Ed. 993, 999, 53 S. Ct. 465, 469.

The purpose of the attorney-client privilege is to encourage and promote full and frank consultation be-

tween a client and legal advisor by removing the fear of compelled disclosure of information. (See 8 Wigmore, Evidence sec. 2291 (rev. ed. 1961); see also *People v. Adam* (1972), 51 Ill. 2d 46, 48 (citing Wigmore's list of the essentials for the creation and continued existence of the privilege).) Under some circumstances, however, the privilege poses an absolute bar to the discovery of relevant and material evidentiary facts, and in the corporate context, given the large number of employees, frequent dealings with lawyers and masses of documents, the "zone of silence grows large." (Simon, *The Attorney-Client Privilege as Applied to Corporations,* 65 Yale L.J. 953, 955 (1956).) That result, in our judgment, is fundamentally incompatible with this State's broad discovery policies looking to the ultimate ascertainment of the truth (*Monier v. Chamberlain* (1966), 35 Ill. 2d 351; see also *Williams v. A. E. Staley Manufacturing Co.* (1981), 83 Ill. 2d 559, 565; *Sarver v. Barrett Ace Hardware, Inc.* (1976), 63 Ill. 2d 454, 459-60), which we continue to find essential to the fair disposition of a lawsuit. (See *Ostendorf v. International Harvester Co.* (1982), 89 Ill. 2d 273.) Its potential to insulate so much material from the truth-seeking process convinces us that the privilege ought to be limited for the corporate client to the extent reasonably necessary to achieve its purpose. As Dean Wigmore admonished:

> "[T] he privilege remains an exception to the general duty to disclose. Its benefits are all indirect and speculative; its obstruction is plain and concrete ***. It is worth preserving for the sake of a general policy, but it is nonetheless an obstacle to the investigation of the truth. It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." (8 Wigmore, Evidence sec. 2291, at 554 (rev. ed. 1961).)

The control-group test appears to us to strike a reasonable balance by protecting consultations with counsel by those who are the decisionmakers or who substantially influence

corporate decisions and by minimizing the amount of relevant factual material which is immune from discovery. We note, too, that the burden of showing facts which give rise to the privilege rests on the one who claims the exemption. (*Cox v. Yellow Cab Co.* (1975), 61 Ill. 2d 416, 419-20; *Krupp v. Chicago Transit Authority* (1956), 8 Ill. 2d 37, 42.) Moreover, the claimant must show certain threshold requirements in order to avail itself of the privilege, including a showing that the communication originated in a confidence that it would not be disclosed, was made to an attorney acting in his legal capacity for the purpose of securing legal advice or services, and remained confidential. (See 8 Wigmore, Evidence sec. 2292 (rev. ed. 1961); *United States v. United Shoe Machinery Corp.* (D. Mass. 1950), 89 F. Supp. 357, 358-59.) Although the control-group test has been noted for its predictability and ease of application, we believe it is necessary to elaborate on those individuals whom we believe should be considered as members of the corporate control group.

In many of the cases in which the control-group test was adopted, the party claiming the privilege either presented no evidence which indicated that the particular employee had any actual authority to make a judgment or decision (*e.g., Golminas v. Teitelbaum Construction Co.* (1969), 112 Ill. App. 2d 445, 449; *Day v. Illinois Power Co.* (1964), 50 Ill. App. 2d 52, 59) or, as in the present case, conceded that none of the employees whose statements were alleged to be privileged were a part of their control group. (See, *e.g., In re Grand Jury Investigation* (3d Cir. 1979), 599 F.2d 1224, 1237.) Some courts have indicated that the labels or titles of the employees are not determinative; rather, the actual duties or responsibilities delegated to these individuals determine their status as decisionmakers. (See *Congoleum Industries, Inc. v. GAF Corp.* (E.D. Pa. 1969), 49 F.R.D. 82, 85, *aff'd* (3d Cir.

1973), 478 F.2d 1398; see also *Honeywell, Inc. v. Piper Aircraft Corp.* (M.D. Pa. 1970), 50 F.R.D. 117, 120 ("persons in management may range from the lowest junior executive or executive trainee to the chairman of the board").) Nevertheless, as a practical matter, the only communications that are ordinarily held privileged under this test are those made by top management who have the ability to make a final decision (see *United States v. Upjohn Co.* (6th Cir. 1979), 600 F.2d 1223, *rev'd* (1981), 449 U.S. 383, 66 L. Ed. 2d 584, 101 S. Ct. 677), rather than those made by employees whose positions are merely advisory (*Congoleum Industries, Inc. v. GAF Corp.* (E.D. Pa. 1969), 49 F.R.D. 82, 85). We believe that an employee whose advisory role to top management in a particular area is such that a decision would not normally be made without his advice or opinion, and whose opinion in fact forms the basis of any final decision by those with actual authority, is properly within the control group. However, the individuals upon whom he may rely for supplying information are not members of the control group. Thus, if an employee of the status described is consulted for the purpose of determining what legal action the corporation will pursue, his communication is protected from disclosure. This approach, we think, better accommodates modern corporate realities and recognizes that decision-making within a corporation is a process rather than a final act. See Note, *Attorney-Client Privilege for Corporate Clients: The Control Group Test,* 84 Harv. L. Rev. 424, 430.

While B-E has conceded that Richard Sailors was not a member of its control group in the usual sense, we must consider whether he qualifies for that group as we have defined it. The record indicates that he began employment with B-E in April 1974, several months after the accident from which this litigation arose. From 1974 through June 1977, he was materials development engineer and reported

directly to the chief engineer; in 1977, he was appointed chief standards engineer, a position he held until August 1980, when he left B-E's employ. According to his affidavit, his duties included "(a) developing and specifying material standards to insure the production of mining and construction machinery of uniform quality; (b) providing technical assistance to the [B-E] engineering departments engaged in the metallurgical and welding aspects of the manufacture of said mining and construction machinery; (c) developing new materials (metals) as required to suit new machine models and applications; (d) conducting tests on and analyzing machinery materials which failed to function properly; and (f) recommending corrective action to remedy material malfunction or failure."

In October 1976, he was contacted by a superior and asked to examine pieces of the machine in question which were in B-E's possession and render an opinion. There is a conflict in the record as to which superior contacted him. B-E's attorney's affidavit indicated that Lennart Hansson, who was B-E's engineer in charge of overseeing technical aspects of litigation involving mining machinery, requested Sailors' assistance; Sailors stated in his deposition that he was contacted by Tom Learmont, B-E's director of engineering-mining machinery whose responsibilities included supervising several chief engineers. In our judgment, it is clear that Sailors was not a member of B-E's corporate control group. As one of several engineers within his department, he supplied information to those whose opinions were sought and relied upon by others such as Hansson who occupied an advisory role and substantially contributed to decisionmaking. It is this fact which is critical, for it seems clear that Sailors' role was one of supplying the factual bases upon which were predicated the opinions and recommendations of those who advised the decisionmakers. While those who directly advise the decisionmakers could, conceivably, come within the control group,

it is evident that Sailors did not.

Accordingly, we hold that Sailors' report is not privileged and must be made available to Consolidation for inspection. The notes and memoranda of B-E's attorneys are exempt from discovery under the work-product doctrine as expressed in this opinion.

Since the attorneys' notes and memoranda are not discoverable, and the question concerning the discoverability of Sailors' report involved issues of first impression in this court, the circuit court's order imposing a fine on B-E's attorney for contempt of court will be set aside. See *Sarver v. Barrett Ace Hardware, Inc.* (1976), 63 Ill. 2d 454, 462.

The judgments of the appellate and circuit courts are vacated, and the cause is remanded to the circuit court of Cook County for further proceedings consistent with this opinion.

*Vacated and remanded.*

JUSTICE SIMON took no part in the consideration or decision of this case.