ARCHER DANIELS MIDLAND COMPANY, Plaintiff-Appellee, v. KOPPERS COMPANY, INC., *et al.*, Defendants (A.O. Smith Harvestore Products, Inc., Defendant-Appellant).

First District (3rd Division)   No. 84—1545

Opinion filed November 20, 1985.

Calliani & Doell, Ltd., of Chicago, for appellant.

Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago (Mayer Goldberg, James T. Ferrini, and Ronald A. Armbrust, of counsel), for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Archer Daniels Midland Company, brought this action to recover damages allegedly sustained on July 7, 1979, when its structure, located in Galesburg and used for the storage of soya meal, collapsed. One of the defendants, A.O. Smith Harvestore Products, Inc., designed, manufactured and sold the product. During the course of pretrial discovery, A.O. Smith refused to produce an employee's report as ordered by the court after several hearings and an *in camera* inspection of the report. (This court has also made an *in camera* inspection of the report.) Trial counsel for A.O. Smith requested the trial court to find him in civil contempt to facilitate appeal. The trial court did so, and A.O. Smith appeals, contending that the report is protected from disclosure by the attorney-client privilege.

Plaintiff purchased the structure in November 1976. The unit was shipped to its Galesburg plant in December 1976, and construction was completed in April 1977. Repairs were required in June 1977 and October 1977. Further problems manifested themselves in October 1978. In July 1979, the unit collapsed and caused damage to plaintiff's property, including the 300 to 350 tons of soya meal stored in the

structure. Plaintiff filed suit, and subsequently initiated discovery.

In August 1982, plaintiff asked A.O. Smith for any documents relating to the storage tank and any documents regarding examination or reports made by experts which touched on the issue raised in the suit. After numerous denials that such documents reflecting expert analysis existed, plaintiff took the deposition of A.O. Smith's senior product engineer, James E. Gordon.

Gordon stated that he performed a study in 1980 at the request of A.O. Smith's in-house counsel. The study, according to Gordon, "was purely an analysis of the structural strengths of each model structure that we had in use for soybean storage. It was a relative comparison of the strength of one model versus the strength of another model, and a projection of what might constitute potential danger versus what might not." The law department had requested the report, according to A.O. Smith, to "provide them with some technical information on structural integrity as it depended upon structure application." A.O. Smith's in-house counsel further described the report as "a review of the structural parameters of all [A.O. Smith] structures and to compare those structural parameters to the structural parameters of particular units for non-agricultural purposes that had resulting problems. Further advice was requested on technical modifications that might be required in the non-agricultural [A.O. Smith] structures."

The report by Gordon was dated November 20, 1980, and was directed to the then acting in-house counsel for A.O. Smith. It was marked "confidential" and copies were given to four individuals in A.O. Smith who had some involvement with product safety. The report apparently was used in making a decision to notify the owners of certain types of A.O. Smith structures of potential dangers in using the structures.

Plaintiff's production request was renewed repeatedly. Numerous hearings were held. The trial court made an *in camera* inspection of the report and found that there was no attorney-client privilege applicable to the report.

■■ The Illinois courts maintain a broad discovery policy, looking to the ultimate ascertainment of truth. (*Monier v. Chamberlain* (1966), 35 Ill. 2d 351, 221 N.E.2d 410.) The courts, therefore, narrowly construe the attorney-client privilege in order to avoid trammeling upon the broad discovery policy. The need for this narrow construction demands particular attention in a corporate context, where the privilege has the potential of posing an absolute bar to the discovery of relevant and material evidentiary facts because of the large

number of employees who frequently contact the corporation's lawyers, and the masses of documents used in business today. (*Consolidation Coal Co. v. Bucyrus-Erie Co.* (1982), 89 Ill. 2d 103, 432 N.E.2d 250.) That holding mandated that we must strive to deter such extensive insulation of these vast amounts of material from the truth-seeking process by limiting the privilege for the corporate client to the extent reasonably necessary to achieve the basic purpose of the privilege. Yet we must remember that the purpose underlying the attorney-client privilege is to encourage and promote full and frank consultation between the attorney and client, and this is done by removing the client's fear that the information will be disclosed by the attorney. *Consolidation Coal Co. v. Bucyrus-Erie Co.* (1982), 89 Ill. 2d 103, 432 N.E.2d 250.

■ The development and adoption of the Illinois test for determining whether an attorney-client privilege exists in a corporate setting are discussed fully in *Consolidation Coal.* The threshold requirements include a showing that the communication originated in a confidence that it would not be disclosed; was made to an attorney acting in his legal capacity for the purpose of securing legal advice or services, and remained confidential. The burden of showing these facts is on the party claiming the exemption. *Cox v. Yellow Cab Co.* (1975), 61 Ill. 2d 416, 337 N.E.2d 15.

In the present case, the report was marked "confidential" and only distributed to the in-house counsel and four other people at A.O. Smith. The attorney used the report to make a recommendation regarding A.O. Smith's potential legal liability. The exact contents of the report have evidently remained confidential, notwithstanding the fact that the end result was to notify customers of potential dangers. The customers were not sent copies of the report.

■ When a corporate client claims the attorney-client privilege, the corporation must go beyond these threshold requirements and show that the employee involved falls within the control group of the corporation, as defined in *Consolidation Coal.* An employee's communications receive the protection of the attorney-client privilege under the umbrella of the "control group" when: (1) the employee is in an advisory role to top management, such that the top management would normally not make a decision in the employee's particular area of expertise without the employee's advice or opinion; and (2) that opinion does in fact form the basis of the final decision by those with actual authority. (*Consolidation Coal Co. v. Bucyrus-Erie Co.* (1982), 89 Ill. 2d 103, 432 N.E.2d 250.) Employees not within the control group include those whom top management merely relies upon for

supplying information. *Consolidation Coal Co. v. Bucyrus-Erie Co.* (1982), 89 Ill. 2d 103, 432 N.E.2d 250.

A.O. Smith argues here that Gordon advised the legal department as to what should be done regarding the product safety problems because legal counsel lacked the necessary technical and scientific expertise. No corporate decision maker, however, makes decisions in a vacuum. They necessarily depend upon information from other persons. When a manufacturer faces potential liability due to product design defects, the corporation typically goes through a decision-making process. It first must gather information from various sources. Hypothetically, the decision makers might ask computer operators to find relevant data in the computer files; clerks to summarize in a report all of the relevant correspondence, testing, examinations, and reports gathered by the corporation over the years; engineers to review previously approved designs and comment and recommend in light of new information showing the designs or manufacturing is causing safety problems; or other scientific experts to analyze technical aspects underlying the product's defects. None of these employees are necessarily within the *Consolidation Coal* definition of control group, regardless of how expert their skills are, or how inexperienced the decision makers are in those same skills. A.O. Smith's argument that its legal counsel lacked technical expertise to develop a recommendation fails to convince us that Gordon was rendering the type of opinion required by *Consolidation Coal.*

■ In defining "control group," *Consolidation Coal* refers to decision makers or those who "substantially influence" corporate decisions. The court, however, focused on individual people who substantially influenced decisions, not on facts that substantially influenced decisions. Here, Gordon supplied technical data and opinions to people within A.O. Smith who then decided what to do with that information. The decision to notify owners of A.O. Smith structures of potential dangers was not a decision in which Gordon participated except to provide technical data and his analysis of that data. His opinions were technical opinions in regard to the designs and manufacture of those structures, not opinions about the corporate policy. As an engineering expert, Gordon supplied information, technical recommendations, and opinions to employees, such as the corporate in-house counsel, whose legal opinions were sought and relied upon by others, such as A.O. Smith's top management, who ultimately made the decision to send notices to customers. Gordon, therefore, was not part of the control group as defined by *Consolidation Coal.* Thus, we hold that Gordon's report is not privileged and must be made available for inspection.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

WHITE, P.J., and McGILLICUDDY, J., concur.