**CAREMARK, INC., Plaintiff,**

v.

**AFFILIATED COMPUTER SERVICES, INC., Defendant.**

**No. 99 C 1005.**

United States District Court,
N.D. Illinois,
Eastern Division.

April 4, 2000.

Howard M. Pearl, Thomas J. Wiegand, Winston & Strawn, Chicago, IL, for Plaintiff.

Lisa M. Cipriano, Sidley & Austin, Chicago, IL, for KPMG.

Edward C. Fitzpatrick, John F. Kloecker, Lord, Bissell & Brook, Chicago, IL, for Defendant.

## *MEMORANDUM OPINION AND ORDER*

MORTON DENLOW, United States Magistrate Judge.

This case presents the novel issue of whether the Illinois attorney-client privilege protects communications between a non-employee agent and the corporation's attorneys, where the agent has express authority to coordinate legal review of contracts and service relationships for the purpose of renegotiating its terms. This Court holds that it does. Defendant Affiliated Computer Services, Inc. ("ACS") filed its Amended Motion to Compel Production of Documents by Subpoena Respondent KPMG LLP ("KPMG"). KPMG refused to produce the requested documents. Plaintiff Caremark Inc. ("Caremark") contends the documents are protected by the attorney-client privilege because KPMG was acting as Caremark's agent at the time of the communications. For the reasons set forth in this opinion, the Court grants in part and denies in part Defendant's Amended Motion to Compel.

## I. BACKGROUND FACTS

This issue arises in the context of a contract dispute between Caremark and ACS. Caremark filed its Complaint against ACS on February 16, 1999, alleging breach of certain terms granting Caremark "most favored" client status in a computer outsourcing service agreement between Caremark and ACS.

On December 1, 1997, MedPartners, Caremark's parent corporation, entered into a service agreement with KPMG. According to this agreement, KPMG would assist MedPartners and its subsidiary Caremark in assessing computer outsourcing services performed for Caremark, including services provided by ACS. The KPMG engagement letter, dated December 1, 1997, outlined the scope of this assessment, including express authorization for KPMG to engage outside legal counsel to provide legal advice related to the ACS contract for the purposes of possible renegotiation. "As agreed, we will coordinate a review of your contracts with external legal counsel and recommend possible points for renegotiation." Caremark's Mem., Ex. A at 3. The engagement letter further specifies that "[f]ees for external legal review will be in addition to KPMG's fees, and are estimated not to exceed $10,000. Such fees will be paid directly to the legal firm providing services." *Id.* at 5. The engagement letter was authored by James Murphy, identified as Engagement Director for KPMG. *Id.* at 4 and 6[1]. The letter is

---

1. There is some confusion in the record regarding Mr. Murphy's position during this period. He was identified as a KPMG Partner in Charge of Engagement. See Letter from Winston & Strawn dated February 18, 2000. Mr. Murphy was also identified as a Senior Manager. See

authorized in writing by John M. Deane, Executive Vice President of MedPartners on December 8, 1997. *Id.* at 7.

In January, 1998, the law firm of Jenner & Block was engaged by KPMG to review the MedPartners/ACS contract. The Jenner & Block engagement letter identifies this contract as included in its review and acknowledges MedPartners as the ultimate recipient of this analysis. The Jenner & Block engagement letter is addressed to James Murphy at KPMG and does not identify MedPartners or Caremark as the client. Legal advice provided by Jenner & Block was considered by John Deane and other Caremark and MedPartners executives when making decisions regarding the ACS contract. Deane Aff. at 1–2.

In March, 1998, MedPartners and Caremark engaged the law firm of Shaw Pittman Potts & Trowbridge ("Shaw Pittman") to conduct further legal analysis on the ACS contract. Deane Aff. at 2. Shaw Pittman worked in conjunction with KPMG for the purpose of providing this legal advice and analysis. As a result, documents were shared between KPMG, Shaw Pittman, MedPartners, and Caremark. Legal advice provided by Shaw Pittman was considered by John Deane in making decisions regard the ACS contract. *Id.*

On November 4, 1999, ACS served a subpoena to KPMG requesting the production of documents in KPMG's possession related to services provided by KPMG to MedPartners/Caremark in 1997 and 1998. On December 15, 1999, KPMG produced documents and served objections and a privilege log listing items withheld on grounds of claimed privileges, including attorney-client privilege. ACS filed a Motion to Compel Production of Documents by Subpoena Respondent KPMG and oral arguments were heard February 16, 2000.

## II. DISCUSSION

### A. Illinois control-group test generally.

■ There is federal jurisdiction over this case by reason of diversity of citizenship. The issue of attorney-client privilege is governed by Illinois law. FED.R.EVID. 501 (stat-ing in civil actions involving an element of a claim or defense to which state law supplies the rule of decision, the privilege of a witness or person shall be determined in accordance with state law.) The test for attorney-client privilege in Illinois is set by *Consolidation Coal Co. v. Bucyrus–Erie Co.*, 89 Ill.2d 103, 59 Ill.Dec. 666, 432 N.E.2d 250 (1982). This was the first case in which the Illinois Supreme Court considered the control-group test for the application of the attorney-client privilege after the United States Supreme Court's decision in *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (rejecting the control-group test as the governing test in Federal courts). The court stated that the scope of the privilege should be "limited for the corporate client to the extent reasonably necessary to achieve its purpose" *Consolidation Coal*, 89 Ill.2d at 118, 59 Ill.Dec. 666, 432 N.E.2d at 257. To this end, the privilege must be narrowly construed. *Id.* The burden of establishing facts that give rise to the privilege rests with the party claiming privilege. That party must show that "the statement originated in a confidence that it would not be disclosed, was made to an attorney acting in his legal capacity for the purpose of securing legal advice or services, and remained confidential." *Hyams v. Evanston Hospital*, 225 Ill.App.3d 253, 258, 167 Ill.Dec. 512, 515, 587 N.E.2d 1127, 1130 (1st Dist. 1992).

■ The *Consolidation Coal* court acknowledged that "as a practical matter, the only communications that are ordinarily held privileged under this test are those made by top management who have the ability to make a final decision." *Consolidation Coal*, 89 Ill.2d at 120, 59 Ill.Dec. 666, 432 N.E.2d at 258. However, the court recognized that the privilege extended to a second tier of employees "whose advisory role to top management in a particular area is such that a decision would not normally be made without [their] advice or opinion, and whose opinion in fact forms the basis of any final decision by those with actual authority." *Id.* If such an employee is consulted to determine a legal

---

Letter from Sidley & Austin dated February 22, 2000. However, regardless of Mr. Murphy's spe-cific job title, the outcome of this motion does not change.

course of action, that employee's communication is protected from disclosure. *Id.*

Application of the privilege is "restricted to confidential legal advice from a lawyer. If the advice sought is that from an accountant rather than from a lawyer, there is no privilege." *CNR Investments, Inc. v. Jefferson Trust and Savings*, 115 Ill.App.3d 1071, 1075, 71 Ill.Dec. 612, 615, 451 N.E.2d 580, 583 (3rd Dist.1983). ACS argues that any information KPMG provided to MedPartners/Caremark was business advice and therefore, not privileged. However, KPMG has produced all documents that were strictly business advice related, and the Court is left with only a handful of documents on which to rule, most of which clearly contain legal advice.

**B. While there is no Illinois case law directly addressing the issue of whether a non-employee agent can be a member of the principal's control-group, there is case law supporting the privilege where confidential attorney/client communications are revealed to the client's third-party agent for the purpose of obtaining legal advice.**

This is a case of first impression on the narrow issue of whether a non-employee agent can be a member of the principal's control-group for the purpose of asserting attorney/client privilege. The cases cited by the parties do not directly address this issue. ACS relies upon *Barrett Indus. Trucks, Inc. v. Old Republic Ins. Co.*, 129 F.R.D. 515, 517 (N.D.Ill.1990) for the proposition that the district court "refused to extend the attorney-client privilege to communications between a consultant and the client's attorneys." ACS' Reply at 1. This overstates Judge Holderman's holding in that case. In *Barrett*, the court held that "the attorney-client privilege, as applied by the courts of Illinois, does not extend to communications with former employees of a client corporation now employed as 'litigation consultants.'" *Barrett*, 129 F.R.D. at 517. Therefore, the court's ruling in *Barrett* addresses the narrow situation where a company hires a former employee as a litigation consultant when the former employee was a key witness in the litigation.

Caremark cites *Allianz v. Rusty Jones, Inc.*, 1986 WL 6950 (N.D.Ill.1986) for the proposition that including a third-party agent in a communication between a client and attorney does not destroy the privilege so long as the third-party was providing information necessary for the attorney "to render advice on the legal questions." Caremark's Mem. at 6. While Judge Holderman's decision in *Allianz* is not that broad, it supports finding attorney-client privilege in some situations where a third-party agent is included in communications between its corporate principal and the corporation's legal counsel.

The factual background of *Allianz* parallels that of the instant case. The communications involved the president of the parent corporation, Matex International Corporation ("Matex"), on behalf of its subsidiary Rusty Jones Inc. ("Rusty Jones"), Rusty Jones' insurance agent Rollins Burdick Hunter Company, and outside legal counsel for the purpose of obtaining legal advice. Similarly, the issue before this Court arises from a team coordination of the ACS contract review between parent company MedPartners, its subsidiary Caremark, Caremark's agent KPMG, and legal counsel. Unlike the insurance agent in *Allianz*, KPMG was not involved in negotiating the underlying contract between Caremark and ACS, but was consulted after the contract was in place and operative. This fact is balanced, however, by KPMG's express authority to coordinate a legal review of the ACS contract contained in its engagement letter.

The *Allianz* court found that a letter between the client corporation and its attorney, which was in the possession of the corporation's insurance agent, was covered by attorney-client privilege. The court further held that notes related to a telephone call between the client corporation, its attorney and its insurance agent were also covered by the privilege.

The court's ruling was based on the affidavit of the president of Matex. The president provided the insurance agent with a copy of the letter because the agent had "valuable expertise in the insurance field, exclusive access to the representatives of our insurance carriers and had also been directly involved in the negotiation and administration of our existing policies." *Allianz*, 1986 WL 1650 at

*3. Further, the president included the insurance agent in his discussion with legal counsel because "[the agent's] participation was necessary to inform us of the negotiation background and operational details of the policies under discussion." *Id.* While the court did not specifically hold that the insurance agent was a member of the corporate client's control-group, it found that the communications involved were privileged because they "were disclosed to Rusty Jones' agent for the purpose of obtaining legal advice." [2]

### C. Applying the control-group test to a principal/non-employee agent relationship.

While the *Consolidation Coal* court framed the control-group test in terms of the corporate client and its employee, the underlying relationship is one of principal and agent. Therefore, the analysis accommodates a principal/agent relationship which involves a non-employee agent working within the scope of his authority.

This is a logical extension of the holding in *Consolidation Coal* to the narrow situation where the corporation gives express authority to a non-employee agent to communicate with attorneys on behalf of the corporate principal for the purpose of receiving legal advice. This holding is squarely within the public policy articulated in *Consolidation Coal* that a reasonable balance must be struck between "protecting consultations with counsel by those who are the decision makers or who substantially influence corporate decisions and by minimizing the amount of relevant factual material which is immune from discovery." *Consolidation Coal,* 89 Ill.2d at 118, 59 Ill.Dec. 666, 432 N.E.2d at 257. This holding does not suggest an expansion of the control-group test beyond the unique facts of this case.

■ To prove that a non-employee agent is a member of the corporate principal's control-group, the party claiming privilege must show:

1. the non-employee agent served as an advisor to top management of the corporate client;

2. this advisory role was such that the corporate principal would not normally have made a decision without the agent's opinion or advice; and

3. the agent's opinion or advice in fact formed the basis of the final decision made by those with actual authority within the corporate principal.

*Consolidation Coal,* 89 Ill.2d at 120, 59 Ill. Dec. 666, 432 N.E.2d at 258.

Once it is determined that the non-employee agent is a member for the corporate principal's control-group, the party claiming privilege must complete the threshold showing for privilege by proving the communication was made in confidence to an attorney acting in his legal capacity for the purpose of receiving legal advice. *Consolidation Coal,* 89 Ill.2d at 119, 59 Ill.Dec. 666, 432 N.E.2d at 257.

### III. APPLICATION

### A. KPMG was acting as agent of MedPartners/Caremark when it procured Jenner & Block to provide legal analysis of the ACS computer outsourcing contract.

■ The engagement letter between KPMG and MedPartners expressly authorizes KPMG to act as agent for MedPartners to coordinate a review of the ACS contract by outside counsel for the purpose of providing legal advice related to potential renegotiation of the terms of that contract. The engagement letter further establishes payment for these legal services to be separate from payment for KPMG's services and to be made directly to the attorneys involved.

Pursuant to these provisions, KPMG engaged Jenner & Block to review the ACS contract for MedPartners. The engagement letter between KPMG and Jenner & Block does not identify MedPartners or Caremark as the client, does not explain that KPMG is

---

**2.** While the insurance agent in *Allianz* was also an attorney, the court did not indicate that this fact in any way impacted its decision. *See Allianz,* 1986 WL 1650 at *3; *see also Royal Surplus Lines Ins. Co. v. Sofamor Danek Group, Inc.,*

190 F.R.D. 463, 485, fn. 12 (D.Tenn.1999) (citing *Allianz* and noting that "the fact that the broker was also an attorney did not effect the court's analysis.")

acting as agent for another party, and does not establish payment arrangements with anyone other than KPMG. However, since the privilege rests with the client, not the attorney, this Court's inquiry must be focused on the client's perspective. Given the language of the KPMG engagement letter, it is clear that MedPartners believed that it was the principal client and that KPMG was acting as its agent when it retained Jenner & Block for this project. It is also clear that KPMG acted with the understanding that it was agent for MedPartners when it procured Jenner & Block to provide legal advice on the ACS contract.

**B. KPMG was acting as an agent for Med-Partners when it communicated with Shaw Pittman Potts & Trowbridge, a law firm engaged by MedPartners to provide legal advice regarding the ACS computer outsourcing contract.**

The communications between Shaw Pittman and KPMG are a logical extension of KPMG's authority to coordinate a legal review of the ACS contract. Although Shaw Pittman was engaged directly by MedPartners as outside counsel to review the ACS contract, the nature of KPMG's communication with Shaw Pittman was the same as the nature of KPMG's communication with Jenner & Block and MedPartner's in-house counsel. As with Jenner & Block, KPMG was operating in its role as authorized agent and the topic of the legal review was Caremark's outsourcing contract with ACS.

Caremark's approach to the ACS contract project was to assemble a team, including its parent corporation MedPartners, in-house counsel, KPMG as its agent and consultant, Jenner & Block and Shaw Pittman. This is an example of the "modern corporate reality" of decision making as a "process rather than a final act" that the *Consolidation Coal* court intended its control-group test to accommodate. *Consolidation Coal,* 89 Ill.2d at 120, 59 Ill.Dec. 666, 432 N.E.2d at 258.

**C. KPMG was a member of the MedPartners control-group for the outsourcing project.**

1. KPMG, as non-employee agent, served as an advisor to top management of the corporate client MedPartners.

KPMG was engaged by John Deane, then Head of MedPartners' Information Systems Department, and Douglas Mackie, then Med-Partners' Senior Vice President of Information Systems, Operations and Infrastructure to assist executives and in-house counsel of MedPartners and Caremark in assessing ACS computer outsourcing services performed for Caremark. Deane Aff. at 1–2; Mackie Dep. at 39–40.

2. This advisory role in the area of reviewing the ACS computer outsourcing contract was such that the corporate principal MedPartners would not have normally have made a decision without the agent's opinion or advice.

KPMG was recognized by MedPartners executives as an expert in the field of computer outsourcing, bench marking, and financial services and was engaged by MedPartners to provide a detailed analysis of the ACS contract. Mackie Dep. at 39–40.

3. KPMG's opinion or advice formed the basis of the final decision made by MedPartners/Caremark.

John Deane and other executives of MedPartners and Caremark considered the legal advice provided by Jenner & Block, through their agent KPMG, when making decisions about the ACS contract and Caremark's continuing relationship with ACS. Deane Aff. at 2. John Deane also considered the legal advice and analysis of Shaw Pittman, working in conjunction with MedPartners' agent KPMG, when making decisions regarding the ACS contract and the ongoing relationship with Caremark. *Id.*

**D. MedPartners, through their agent KPMG, communicated with Jenner & Block and Shaw Pittman in confidence for the purpose of receiving legal advice.**

Documents were shared between Med-Partners, its subsidiary Caremark, its agent KPMG, and its legal counsel Jenner & Block and Shaw Pittman for the purpose of seeking and providing legal advice regarding the ACS contract. Deane Aff. at 2. MedPartners had the expectation that such documents would be kept confidential and maintained the documents as confidential. *Id.*

## IV. CONCLUSION

KPMG acted as agent for MedPartners and its subsidiary Caremark for the purpose of reviewing the Caremark/ACS contract. The scope of the agency relationship included coordination of legal analysis of the contract, thus KPMG was a member of MedPartner's control-group for this purpose. As a result, communications between KPMG and legal counsel related to this analysis are covered by the attorney-client privilege. **For the foregoing reasons, Defendant's Motion to Compel Production of Documents by Subpoena Respondent KPMG LLP is GRANTED IN PART AND DENIED IN PART** as set forth in the attached Appendix.

## APPENDIX

### V. Appendix: Ruling on Individual Documents

**Documents: 4, 5, 6, 7, 8, 9, 10**

Description: Memoranda and legal analyses of Caremark contracts with ACS and SMS, authored by Jenner & Block and received by James Murphy, Engagement Director for KPMG, contents of which were shared with MedPartners/Caremark.

Ruling: Privileged

**Document: 11*** (previously ordered to be produced, subject to redaction of paragraph 2)

Description: Redacted portion includes description of scope and intent of legal review.

Ruling: Privileged

**Document: 12***

Ruling: Previously ordered to be produced

**Documents: 13, 14, 15, 16**

Description: Proposed letters to ACS drafted by Allen Klein, Shaw Pittman as outside counsel for MedPartners/Caremark and John Deane, MedPartners/Caremark. Received by James Murphy, Engagement Director for KPMG.

Ruling: Privileged

**Documents: 17, 18**

Description: List of questions in preparation for April 30, 1998 meeting between Allen Klein of Shaw Pittman, James Murphy of KPMG, ACS executives and legal counsel. Authored by Allen Klein, Shaw Pittman, outside counsel for MedPartners.

Summary of impressions of April 30, 1998 meeting between Allen Klein of Shaw Pittman, James Murphy of KPMG, ACS executives and legal counsel. Authored by Allen Klein, Shaw Pittman as outside counsel for MedPartners. Received by James Murphy, Engagement Director for KPMG; Lucy Hicks, in-house counsel for MedPartners; John Dean, MedPartners; Douglas Mackie, Information Systems executive for MedPartners; Mike Tedder, Information Systems executive for MedPartners/Caremark.

Ruling: Privileged. The Court recognizes that the individuals who received document 17 are not identified in the document and were not identified in open court. The privilege of 17 is contingent on the fact that this document was delivered to the same control-group individuals as document 18.

**Documents 19, 20, 21, 22***

Ruling: Previously ordered to be produced

**Document: 23**

Description: E-mail for the purpose of requesting legal advice. Prepared by M. Tedder, Information Systems executive of MedPartners/Caremark. Addressed to Allen Klein, Shaw Pittman as outside counsel for MedPartners. Received by James Murphy, KPMG; John Deane, MedPartners; Douglas Mackie, Information Systems executive for MedPartners.

Ruling: Privileged

**Document 24***

Ruling: Previously ordered to be produced.

**Document 25**

Description: ACS Contract Strategy prepared at the request of Julie Fogerty. Prepared by M. Tedder, Information Systems Executive for MedPartners/Caremark. Addressed to Julie Fogerty, as in-house counsel for Caremark. Received by James Murphy, Engagement Director for KPMG.

Ruling: Privileged

**Document: 26**

Description: Handwritten note on fax cover sheet containing legal advice regarding possible ACS contract modifications. Authored by Steve Anderson, in-house counsel for Caremark. Addressed to Mike Tedder, Information Systems executive for MedPartners/Caremark. Received by Ken Byrne, KPMG.

Ruling: Privileged

**Document: 27***

Ruling: Previously ordered to be produced.

**Document: 28** (Previously ordered to be produced with redaction of 3 words)

Description: Authored by Chris Kirk, Engagement Manager for KPMG. Notes entitled "MedPartners Milestones." Redacted portion refers to communication with Michael Walsh, Jenner & Block.

Ruling: Redacted portion privileged

**Document 29**

Description: Handwritten notes detailing a meeting with Douglas Mackie, Information Systems executive of MedPartners; Mike Tedder, Information Systems executive for MedPartners/Caremark; Allen Klein, Shaw Pittman, outside counsel for MedPartners; James Murphy, Director of Engagement for KPMG. Includes summary legal strategy. Authored by Chris Kirk, Engagement Manager for KPMG.

Ruling: Privileged

**Document 30**

Description: Handwritten notes authored by Chris Kirk, Engagement Manager for KPMG. Unclear what the purpose these notes serve or what they memorialize.

Ruling: Produce document. Not privileged.