# Illinois Official Reports

## Appellate Court

---

### *Caldwell v. Advocate Condell Medical Center*, 2017 IL App (2d) 160456

---

| | |
|---|---|
| Appellate Court Caption | JUDITH CALDWELL, Individually and as Special Administrator of the Estate of Jeannette M. DeLuca, Plaintiff-Appellant, v. ADVOCATE CONDELL MEDICAL CENTER, Defendant-Appellee. |
| District & No. | Second District<br>Docket No. 2-16-0456 |
| Rule 23 order filed<br>Motion to publish allowed<br>Opinion filed | July 24, 2017<br><br>October 4, 2017<br>October 4, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 14-L-145; the Hon. Diane E. Winter, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Charles J. Thut, of Noonan, Perillo & Thut Ltd., of Waukegan, for appellant.<br><br>Tanya B. Park and Julie A. Teuscher, of Cassiday Schade LLP, of Chicago, for appellee. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices Hutchinson and Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, Judith Caldwell, individually and as special administrator of the estate of Jeannette M. DeLuca, appeals from the trial court's order entering a jury verdict in favor of defendant, Advocate Condell Medical Center (Condell). On appeal, Caldwell argues that several errors occurred below in this medical malpractice action: (1) the trial court erred in allowing two expert witnesses to testify that DeLuca, Caldwell's mother, had both sets of her dentures in her mouth when she choked on food and died following surgery at Condell; (2) the trial court erred in allowing the evidence deposition of one of Condell's nurses into evidence; (3) the trial court erred in sustaining Condell's objection on the ground of attorney-client privilege during that deposition; (4) Condell's counsel violated the *Petrillo* doctrine (*Petrillo v. Syntex Laboratories, Inc.*, 148 Ill. App. 3d 581 (1986)) when she conducted an *ex parte* meeting with one of Condell's former employees; and (5) the trial court erred in refusing to grant Caldwell a "missing witness" jury instruction. For the following reasons, we affirm.

¶ 2                          I. BACKGROUND

¶ 3    The record reflects that on March 5, 2014, Caldwell filed a medical malpractice action against Condell after 92-year-old DeLuca choked on food and died while receiving medical care from Condell on April 23, 2013. Specifically, Caldwell claimed that Condell, through its agents, failed to adequately monitor DeLuca postoperatively, allowed her to eat without ensuring that her dentures were in her mouth, and failed to ensure that she was recovered from surgery sufficiently to consume food.

¶ 4                       A. Pretrial Proceedings

¶ 5    Before trial, Caldwell's counsel sent a notice to Condell for the discovery deposition of Kathleen Likosar, a nurse manager at Condell. The notice was dated October 20, 2014, and in it, counsel asked Condell's counsel to produce Likosar for her deposition on October 30, 2014. Caldwell's counsel later sent an amended notice for Likosar's deposition on December 9, 2014. Likosar's deposition occurred on December 9, 2014. During that deposition, Condell's counsel objected on the ground of attorney-client privilege to Caldwell's questioning of Likosar about conversations between Likosar and Condell's counsel.

¶ 6    About 30 to 45 days before trial, Condell's counsel contacted Caldwell's counsel to inform him that Likosar was retiring and moving to Arizona and that they would need to set up an evidence deposition. On February 9, 2016, Condell's counsel e-mailed Caldwell's counsel about setting up Likosar's evidence deposition for February 12, 2016. Caldwell's counsel agreed to that date, and the videotaped evidence deposition occurred on February 12, 2016. At that deposition, Caldwell's counsel complained that he never received a notice of the evidence deposition, but he admitted that he agreed to come to the deposition after being notified via

telephone. Caldwell's counsel also argued that he never received notice that the deposition was going to be videotaped. Counsel repeated his objection before he cross-examined Likosar, and he said that the deposition was "being taken without notice as required by supreme court rule." As in the discovery deposition, when Caldwell's counsel questioned Likosar about the substance of conversations between Condell's counsel and Likosar, Condell's counsel objected on the ground of attorney-client privilege. Caldwell's counsel did not take issue with that objection and instead responded merely by saying, "okay," "all right," and "that's fine." Caldwell's counsel also never sought a ruling on the privilege objection.

¶ 7    Before trial began, Caldwell moved to bar Likosar's evidence deposition. Caldwell argued that her counsel had received improper notice of the evidence deposition, and no notice of Condell's intention to videotape that deposition. Caldwell also objected to Condell's assertion of the attorney-client privilege for any conversations between Condell's counsel and Likosar. Caldwell argued that Likosar was not a member of Condell's "control group" and that the communications between Likosar and Condell's counsel that occurred immediately prior to her evidence deposition were not protected by the attorney-client privilege because Likosar's employment with Condell had ceased before then.

¶ 8    In response, Condell's counsel agreed to forgo use of the videotape. In resolving the remainder of Caldwell's notice objections, the court reviewed the e-mail exchanges between the parties. On February 9, 2016, Condell's counsel sent Caldwell's counsel an e-mail saying, "I want to set Likosar's evidence dep for my case for Friday, 2/12/16 at 10 a.m. at Condell. I think you said that works for you . . . can you confirm?" Caldwell's counsel responded that the date "work[ed] for Likosar."

¶ 9    With regard to the objections based upon the attorney-client privilege, Condell argued that Likosar was an agent of Condell and a nurse who was insured under Condell's self-insured trust, both at the time of her care of DeLuca and when she gave her discovery deposition. Also, Likosar established these facts in an affidavit. Finally, Condell argued that, when Likosar gave her discovery deposition, the allegations in Caldwell's complaint had placed Likosar's care of DeLuca at issue.

¶ 10   The trial court found that, absent any case law to the contrary, and Caldwell had submitted none, Likosar's retirement between her discovery and evidence depositions did not determine her status for the purpose of the attorney-client privilege. Therefore, the trial court denied Caldwell's motion to bar Likosar's evidence deposition on the lack-of-privilege ground, as well as the lack-of-notice ground.

¶ 11   Caldwell then moved to bar the opinions of Condell's experts, Dr. Rachael Oosterbaan and nurse Faye Kopplin, that DeLuca had both sets of dentures in her mouth when she ate breakfast on April 23, 2013. At Oosterbaan's discovery deposition, she testified that, in her opinion, DeLuca had both sets of dentures in her mouth, based upon the fact that DeLuca was a "perfectly capable woman who would have asked for her lower dentures when she started eating" and that she was a "cognitively intact woman." When asked whether she was speculating that both sets of dentures were in DeLuca's mouth when she ate breakfast, Oosterbaan said that, based upon the evidence, it was safe to say that the lower dentures were in place. This opinion was based specifically upon her interpretation of the facts in the depositions and in DeLuca's medical chart.

¶ 12   At Kopplin's discovery deposition, she testified that, in her opinion, DeLuca's lower dentures more likely than not stayed in her mouth while she was at Condell. Her opinion was

- 3 -

based upon several factors, including that DeLuca was alert and oriented, had managed her own dentures for over 40 years, and would have asked for her dentures if they were missing; further, if she had asked for her dentures, that information would have been noted in her medical chart. Kopplin also noted that DeLuca's chart created a timeline of what transpired with her upper and lower dentures. The upper dentures were removed for DeLuca's surgery and reinserted in the recovery area, or "Post-Anesthesia Care Unit" (PACU). There was no indication in the chart that DeLuca's lower dentures were ever removed. Kopplin opined that, based upon her experience with elderly patients, the first thing that they request when they wake up from anesthesia is their dentures. In addition to reviewing DeLuca's medical records, Kopplin had also reviewed the deposition testimony of all the witnesses in this case. Kopplin opined, to a reasonable degree of medical certainty, that DeLuca's lower and upper dentures were in her mouth when she ate her breakfast on April 23, 2013.

¶ 13      The trial court denied Caldwell's request to exclude Oosterbaan's and Kopplin's opinions.

¶ 14                                B. Trial Proceedings

¶ 15      At trial, Caldwell testified that, on April 22, 2013, she arrived home around 5 p.m. and found DeLuca sitting in a chair with a bump on her head and a very red eye. DeLuca said that she could not see out of that eye because she had hit her head. Caldwell called DeLuca's ophthalmologist, who directed them to the emergency room.

¶ 16      Caldwell and her husband took DeLuca to Condell, where she was seen in the emergency room. When they arrived, they were told that DeLuca should see Dr. Michael Savitt at his office. Savitt examined DeLuca and determined that surgery was necessary on DeLuca's eye. Caldwell took DeLuca back to Condell, arriving around 10:30 p.m. that night. DeLuca was admitted to floor 2-West at Condell. Prior to her admission, the last food DeLuca had consumed was at noon that day. Caldwell testified that DeLuca was very "vain" about her dentures and that she never wanted Caldwell to see her without her dentures in her mouth. Caldwell said that, even when she went into surgery, DeLuca would not take her dentures out before she was wheeled away from Caldwell. DeLuca was able to take care of her dentures by herself, and she never ate without her dentures in her mouth.

¶ 17      Caldwell said that Shannon Lunkenheimer checked DeLuca in on 2-West. Caldwell stayed with DeLuca until she was wheeled out of her room and taken to surgery. At that time, DeLuca had both her upper and lower dentures in her mouth. Caldwell testified that she had no idea if DeLuca's dentures were in place during surgery, when DeLuca returned to 2-West following surgery, or when DeLuca was eating her breakfast the next morning.

¶ 18      Lunkenheimer testified that she was a registered nurse working at Condell on 2-West, the medical/surgical unit, at around 10 p.m. on April 22, 2013. She interviewed DeLuca that evening as a new admission to the floor. Lunkenheimer asked DeLuca about her dentures, and DeLuca told her that she had upper dentures and a lower partial plate. Lunkenheimer did not remove DeLuca's dentures when DeLuca left 2-West and was transported to the operating room.

¶ 19      Lunkenheimer said that, if DeLuca's dentures had been removed, they would have been placed at her bedside in a cup with her name on it. Lunkenheimer had cared for elderly patients who had dentures, and she realized the importance of tracking their dentures. In her experience, most patients were very aware when their dentures were not in their mouths.

¶ 20    Bella Patseyevsky testified that she was a registered nurse who worked at Condell in the operating room, as a circulating nurse preparing cases for surgery. As a circulating nurse, she interviews patients before surgery and brings them into the surgical suite. When the procedure is completed, Patseyevsky brings the patient to the recovery room.

¶ 21    On April 22, 2013, Patseyevsky was working as the circulating nurse, on a 3 p.m. to 11:30 p.m. shift. She remembered DeLuca because of the emergency nature of the surgery. As part of her routine, she interviews the patient and asks him or her about personal effects, including dentures. Patseyevsky asked DeLuca about her dentures because she knew that DeLuca was undergoing general anesthesia. When a patient's dentures are removed before an endotracheal tube is placed in the mouth, the dentures are placed in a cup with the patient's name on the cup. The dentures are then kept on a counter in the operating room.

¶ 22    Patseyevsky testified that DeLuca removed only her upper dentures and handed them to Patseyevsky, who then placed them in a cup. The cup would have been placed on DeLuca's cart during her trip from the preoperative area to the operating room. When she was transferred from the cart to the operating table, the cup would have been placed on a shelf in the operating room.

¶ 23    DeLuca was in the operating room from 10:45 p.m. until 12:06 a.m. After surgery, Patseyevsky moved DeLuca from the operating room to the PACU. Generally, Patseyevsky takes a cup containing dentures from the shelf in the operating room and places it back on the patient's cart following surgery. In DeLuca's chart, Patseyevsky noted that her upper dentures were "endorsed to recovery room nurse." She made no entry regarding the lower dentures, and she would have endorsed both dentures if she had removed the lower ones. In her experience, while upper dentures always come out prior to surgery, there are occasions when a lower partial plate remains in the patient's mouth. If a lower partial plate is not removable, it stays in the patient's mouth during surgery.

¶ 24    Kim Kraus testified that she was the nurse who covered DeLuca in the recovery room following surgery. She took over DeLuca's nursing care at 12:06 a.m. on April 23, 2013. She assessed DeLuca at 12:36 a.m. and initially noted that DeLuca was sleepy but responded to her and was "arousable." Before she sent DeLuca back to her hospital room, she wrote in her chart, "final comments, upper dentures in mouth." According to Kraus, this meant that she either placed the upper dentures in DeLuca's mouth or gave the dentures to DeLuca to insert herself. If DeLuca had lower dentures that were not in her mouth, but were in a cup, Kraus would have documented that fact. If both lower and upper dentures had been in the cup, Kraus would have placed both of them in DeLuca's mouth. The fact that she documented that the upper dentures were in DeLuca's mouth told Kraus that DeLuca was alert and able to place dentures securely in her mouth. According to Kraus, at 12:42 a.m., DeLuca met the criteria for discharge from the PACU, and she was then returned to the medical/surgical unit, at which point either Kraus or the assistant working with her handed DeLuca over to the medical/surgical floor nurse.

¶ 25    Deanne Awit testified that she was the registered nurse who accepted DeLuca back onto 2-West in the early morning hours of April 23, 2013. Awit assessed DeLuca at 12:45 a.m., and took care of DeLuca throughout the night. Around 3 a.m., Awit gave DeLuca medication. At 6 a.m. she performed an abdominal exam on DeLuca, and at 6:58 a.m. she checked DeLuca's vital signs. Awit never had any concerns regarding DeLuca's condition.

¶ 26    Awit said that she did not recall if she saw DeLuca's dentures on her bedside table. If she had seen her dentures, she would have placed them in a cup. Her shift ended at 7 a.m. on April

- 5 -

23, and she provided a report to the nurse beginning the next shift. She did not see breakfast being delivered to DeLuca. If she had had any concerns about DeLuca, she would not have allowed her to eat breakfast.

¶ 27    Awit responded to a rapid-response call concerning DeLuca around 7:20 a.m. She responded to the call after her shift ended because she knew DeLuca as a patient better than the morning nurse did. She ran to DeLuca's room with Likosar and watched Likosar remove DeLuca's upper dentures and perform a mouth sweep. She did not remember anything about DeLuca's lower partial plate. A code team then took over.

¶ 28    Helen Dockery testified that she was the patient-care technician (PCT) on duty on 2-West between 12:45 a.m. and 6:30 a.m. on April 23, 2013. There were two PCTs on duty during her shift, and each cared for half of the patients on the floor. Dockery's duties were to take vital signs, assist patients as needed, and advise a nurse if a patient had a problem. Dockery recorded nine sets of vitals for DeLuca during her shift, and she did not have any concerns about DeLuca. During her shift, Dockery took DeLuca to the bathroom. She first had DeLuca sit at the end of the bed to make sure that DeLuca was not dizzy and was able to walk. After DeLuca used the bathroom, Dockery walked her back to her bed.

¶ 29    At some point during Dockery's shift, DeLuca told Dockery that she was hungry. Dockery obtained a menu for DeLuca, who said that she wanted pancakes. Dockery placed DeLuca's order at 6:30 a.m. when Condell's kitchen opened. It usually takes 30 to 45 minutes for food to arrive after it is ordered.

¶ 30    Dockery testified that she did not see DeLuca's dentures on her bedside table. If they had been there, she would have placed them in a cup. DeLuca did not ask her for help with her dentures. When Dockery's shift ended at 6:30 a.m., she would have reported to the next PCT that DeLuca was postoperative and that breakfast had been ordered for her. If Dockery had had any concerns about DeLuca's condition, she would not have allowed DeLuca to eat breakfast. Dockery did not see DeLuca between 6:30 a.m. and 7 a.m.

¶ 31    Christina Riek testified that she was also working as a PCT on 2-West on April 23, 2013. She normally worked in the intensive-care unit, but she was asked to be a "floater" on 2-West that day. Her shift began at 6:30 a.m., and she would have received a report from staff on the outgoing shift. Riek had two interactions with DeLuca. The secretary on the unit told Riek that DeLuca's breakfast tray had arrived. Riek went to DeLuca's room and asked her the usual questions, such as, "Do you need anything? Are you okay? Just broad questions." She further testified, "Nothing looked out of place or out of the ordinary. And I just continued. I went to the next room."

¶ 32    Riek did not recall asking DeLuca whether she needed assistance with her dentures. She had no specific memory as to whether DeLuca had her dentures in place. When she returned for a second visit to get DeLuca's vital signs, DeLuca did not look right. Riek went across the hall and asked the secretary to call for a rapid response. She was not part of the rapid-response team, and she stayed outside DeLuca's room at that time.

¶ 33    Likosar's evidence deposition was read to the jury, without the use of the videotape. In her deposition, Likosar said that she worked as a nurse for 45 years until she retired on January 5, 2016. At the time of this incident, she worked at Condell as a nurse manager on 2-West, a floor that frequently had elderly patients.

¶ 34    Likosar was working as a nurse manager on 2-West on April 23, 2013, and she was a member of the rapid-response team that was summoned to DeLuca's room. When she arrived, DeLuca was unresponsive. She performed a mouth sweep and removed DeLuca's upper dentures and pieces of pancake. Likosar did not document that she removed DeLuca's upper dentures, but that was a customary practice. After she took the upper dentures out, she placed them on the bedside table. She did not recall what happened to the dentures after that point. When a patient dies, their dentures are placed in a cup that goes with the patient to the morgue. Likosar did not know if DeLuca had a lower plate, and she had no memory of removing a lower plate.

¶ 35    Finally, Likosar testified that, after a patient dies, the PCT performs postmortem care, including placing the patient's dentures in a cup to be taken to the morgue. Likosar called the coroner at 9:30 a.m. She did not know who attended to Likosar's body between 8:30 a.m. and 10 a.m., when the coroner arrived.

¶ 36    Stephen Carroll testified that he was the Lake County deputy coroner who transported DeLuca's body from Condell to the coroner's facility. When he arrived in DeLuca's room, a bag was attached to her body. The bag held a denture container. Carroll did not know if the container had both sets of dentures in it because he did not open it. Carroll then transported Deluca's body to the coroner's office. The custom in the coroner's office was to keep the dentures with the body, but he could not recall if that was specifically done in this case. He did not perform the autopsy on DeLuca.

¶ 37    Karen Krooswyk testified that she was an advance-practice nurse who reviewed this case as an expert for Caldwell. Krooswyk described DeLuca as a very functional elderly lady who faithfully removed her dentures at night, had no history of problems with her dentures or with chewing or swallowing, and removed, cleaned, and replaced her dentures by herself. DeLuca did not require nursing care at home and had been caring for her dentures for many years. Krooswyk saw no indication that DeLuca ever ate without her dentures in place. Also, nothing in the record suggested that DeLuca was incapable of asking for her dentures if they were missing at breakfast. Elderly patients frequently requested their dentures in the hospital. Krooswyk admitted that anyone could choke, including someone with all their teeth in place. When asked whether DeLuca's lower partial plate made it out of the operating room, Krooswyk said that that was a "mystery" and that she could not figure out what happened to it.

¶ 38    Krooswyk opined that Condell's nurses and PCTs failed to give DeLuca liquids, failed to assist her with her diet, failed to assess her ability to eat, failed to ensure that both dentures were in place, and failed to monitor her while she was eating. Krooswyk acknowledged, however, that she had not worked on a medical/surgical floor since about 1979.

¶ 39    Krooswyk agreed that nothing in the record established that DeLuca's lower partial plate was ever removed. Hospital personnel had approximately 14 contacts with DeLuca between 12:45 a.m. and 7:20 a.m. on April 23, 2013. Krooswyk agreed that DeLuca was alert and oriented when she returned to 2-West after surgery. Also, nothing in DeLuca's chart indicated that she needed assistance with eating. Krooswyk admitted that someone could have watched DeLuca chew and swallow, determine that it was safe for her to eat, and walk out of the room, and that DeLuca still could have choked.

¶ 40    Dr. Steven Fox testified that he was a doctor of osteopathic medicine with a subspecialty in geriatrics. He was asked to render causation opinions on behalf of Caldwell. He treats geriatric patients, but he has no hospital affiliations. In Fox's opinion, all of the deviations that

- 7 -

Krooswyk testified about could have been a proximate cause of DeLuca's death. DeLuca died of asphyxia due to an airway obstruction. In Fox's opinion, if DeLuca's dentures had been in place, she would have been able to chew and break up her food particles. Also, he believed that DeLuca suffered from postoperative cognitive dysfunction and was probably not fully alert or capable of swallowing, due to the effects of general anesthesia on someone her age. However, he agreed that there was no objective evidence of cognitive impairment and that DeLuca's chart indicated that she was alert and oriented, with clear speech.

¶ 41    Kopplin testified as a nursing expert on behalf of Condell. At the time of the trial, Kopplin worked in an internal-medicine practice, but she had worked in a hospital setting for 38 years, predominately in the PACU. In Kopplin's opinion, the nurses and PCTs at Condell complied with the standard of care in their treatment of DeLuca. Nurses are not required to document if dentures remain in a patient's mouth; they must document only when they are removed.

¶ 42    Kopplin opined that both DeLuca's upper dentures and her lower partial plate were in her mouth when she was eating her breakfast on April 23, 2013. In forming this opinion, Kopplin relied upon her experience that dentures are the first thing a patient requests upon arrival in the PACU. Also, DeLuca was noted to be alert and oriented—a sharp elderly lady who always managed her own dentures. In addition, Kopplin noted that there was no documentary evidence that DeLuca's lower partial plate was ever removed, lost, or missing. Further, there was no evidence in DeLuca's chart that anyone ever removed DeLuca's lower partial plate. Kopplin explained that some partial plates have clips and remain in a patient's mouth for surgery.

¶ 43    In Kopplin's opinion, DeLuca did not require supervision to eat her breakfast on April 23, 2013. There was no evidence of cognitive impairment, and she was alert and sharp. The nurses and the PCTs were not required to stand there and watch while DeLuca ate her breakfast. Kopplin said that, in addition to reviewing DeLuca's medical records, she had also reviewed the deposition testimony of all the witnesses in this case. She opined, to a reasonable degree of medical certainty, that DeLuca's lower partial plate and upper dentures were in her mouth when she ate her breakfast on April 23, 2013.

¶ 44    Oosterbaan testified that she is a doctor of internal medicine and that she was asked by Condell to review this case. In her opinion, nothing that the nurses and the PCTs did, or did not do, contributed to DeLuca's death. Oosterbaan based her opinion on the evidence that DeLuca was independent, managed her own dentures, and was cognitively intact. DeLuca requested a menu, ordered her food, and unfortunately suffered a choking incident.

¶ 45    Oosterbaan also opined that DeLuca had both dentures in place when she choked and that the lower partial plate remained in DeLuca's mouth the entire time she was at Condell. She based this opinion on the depositions and medical records in this case. Specifically, Lunkenheimer documented upon admission that DeLuca had upper dentures and a lower partial plate. Patseyevsky removed only the upper dentures in the operating room, those dentures were sent to the PACU in a cup with DeLuca's name on it, and Kraus documented that she placed DeLuca's dentures back in her mouth.[1] There was no documentation in the chart establishing that the lower partial plate was ever removed, only that it was in place when

_____

[1]Actually, Patseyevsky testified that DeLuca took out her upper dentures and handed them to her. Also, Kraus testified that her charting comment, "upper dentures in mouth," meant that either DeLuca put the dentures in her mouth alone or Kraus helped DeLuca put them in.

- 8 -

DeLuca was sent to the operating room. In Oosterbaan's opinion, it was more likely than not that DeLuca's lower partial plate remained in her mouth because those plates are much more difficult to take out. They have to be clipped in, and they are much more stable in the mouth, making it likely that there was no need to take DeLuca's lower partial plate out. When asked whether she believed that DeLuca had any cognitive dysfunction, Oosterbaan said "absolutely not." DeLuca was a healthy 92-year-old woman, who, according to Caldwell, lived independently. Oosterbaan specifically testified that she was not speculating about what happened to the dentures and that her opinion was medical and not personal.

¶ 46 During the jury instruction conference, Caldwell tendered Illinois Pattern Jury Instructions, Civil, No. 5.01 (approved Dec. 8, 2011) ("Failure To Produce Evidence or A Witness") (hereinafter IPI Civil No. 5.01). Caldwell argued that Helen Dockery testified that there were two PCTs working on 2-West during her shift and that they each cared for half of the patients on the floor. However, Riek was the only one who had been identified as working the day shift on April 23, 2013. In addition, Caldwell argued, Riek could not recall whether she did the postmortem care on DeLuca's body. The court responded that, because Riek did not remember whether she did the postmortem care, she might have done it but have forgotten.[2] Therefore, the court rejected Caldwell's request for IPI Civil No. 5.01, finding that a witness's inability to remember the identity of an individual did not entitle Caldwell to a "missing witness" instruction. Instead, the court said, such a jury instruction is appropriate where a party fails to produce at trial a specific witness with knowledge of an occurrence.

¶ 47 The jury returned a verdict in Condell's favor. Caldwell filed a motion for a new trial. At the hearing on the posttrial motion, Condell's counsel informed the court that she had reread Riek's testimony and noted that Caldwell never asked Riek whether she performed the postmortem care on DeLuca (as opposed to Caldwell's assertion at the jury instruction conference that Riek testified that she could not remember whether she performed the postmortem care on DeLuca). In denying Caldwell's posttrial motion, the court referred to Caldwell's argument regarding IPI Civil No. 5.01, and agreed that Riek was never asked if she performed the postmortem care on DeLuca.

¶ 48                                   II. ANALYSIS

¶ 49 On appeal, Caldwell argues that the trial court made multiple significant errors in managing the evidence introduced at trial, which, combined, rose to the level of an abuse of discretion. Therefore, Caldwell requests that this court reverse the trial court's order denying her posttrial motion and remand this case for a new trial on all issues. Specifically, Caldwell contends that the following errors occurred: (1) the trial court erred in allowing Kopplin and Oosterbaan to testify that DeLuca had both sets of dentures in her mouth when she choked on food and died following surgery at Condell; (2) the trial court erred in allowing Likosar's evidence deposition into evidence; (3) the trial court erred in sustaining Condell's objection to the substance of conversations between Condell's counsel and Likosar on the ground of attorney-client privilege during the evidence deposition; (4) Condell's counsel violated the *Petrillo* doctrine when she conducted an *ex parte* meeting with Likosar; and (5) the trial court

_____
[2]The record reflects, however, that Riek was never asked if she performed DeLuca's postmortem care.

erred in refusing to grant Caldwell a "missing witness" jury instruction.

¶ 50                                    A. Condell's Expert Witnesses

¶ 51        Caldwell first argues that the trial court erred when it denied her motion *in limine* to bar Oosterbaan's and Kopplin's testimony that they believed that DeLuca had both sets of dentures in her mouth when she choked on pancakes the morning after her surgery at Condell. Specifically, she argues that the only person who took care of DeLuca when she was in distress was Likosar. However, Likosar testified that she removed only DeLuca's upper dentures while attempting to clear her airway and that she never saw any lower dentures. Also, DeLuca's lower dentures were not in her mouth when she was autopsied. Nevertheless, Caldwell complains, both of Condell's experts were allowed to testify that DeLuca's lower dentures must have been in her mouth when she died because (1) there was no charting in the file that indicated that the lower dentures were ever removed and (2) DeLuca would have complained if her dentures were not in her mouth. Caldwell claims that the issue of whether the dentures were in place at the time of DeLuca's death is a matter of fact, and not of opinion. She also argues that Oosterbaan admitted that her opinion was not a medical one. Instead, she said that it was based upon the depositions and the medical records in this case. Caldwell claims that Oosterbaan's and Kopplin's opinions were based upon guess, speculation, and conjecture, without any basis in the medical records or in the depositions of the medical professionals who took care of DeLuca.

¶ 52        "Expert testimony is admissible if the proffered expert is qualified by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence." *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003). The proponent must lay an adequate foundation establishing the reliability of the information on which the expert's opinion is based. *Fronabarger v. Burns*, 385 Ill. App. 3d 560, 565 (2008). " 'If the basis of an expert's opinion includes so many varying or uncertain factors that he is required to guess or surmise to reach an opinion, the expert's opinion is too speculative to be reliable.' " *Modelski v. Navistar International Transportation Corp.*, 302 Ill. App. 3d 879, 885 (1999) (quoting *First Midwest Trust Co. v. Rogers*, 296 Ill. App. 3d 416, 427-28 (1998)). Once a proper foundation has been established, the weight to be assigned to the expert's opinion is for the jury to determine. *Fronabarger*, 385 Ill. App. 3d at 565. The decision of whether to admit expert testimony is within the sound discretion of the trial court, and the trial court's ruling will not be reversed absent an abuse of that discretion. *Snelson*, 204 Ill. 2d at 24. A trial court abuses its discretion where its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *Taylor v. City of Cook*, 2011 IL App (1st) 093085, ¶ 23.

¶ 53        After a careful review of the record, we determine that the trial court did not abuse its discretion in denying Caldwell's motion *in limine* and in allowing Oosterbaan and Kopplin to testify as Condell's expert witnesses. First, even if we agreed with Caldwell that whether the dentures were in DeLuca's mouth when she died is an issue of fact, it is well settled that an expert's testimony on an ultimate fact or issue does not impermissibly intrude on the fact finder's role, as long as all of the other requirements for the admission of the testimony are met. *Jackson v. Seib*, 372 Ill. App. 3d 1061, 1071 (2007) (citing *Zavala v. Powermatic, Inc.*, 167 Ill. 2d 542, 545 (1995)). The reason for this is that the trier of fact is not required to accept the expert's conclusion. *Id.*

¶ 54        Second, Caldwell does not challenge Oosterbaan's or Kopplin's qualifications to be experts in this case. Instead, she argues that their opinions were "speculative." However, the record is clear that Caldwell is incorrect. At her deposition, Kopplin testified that DeLuca's dentures were more likely than not in her mouth when she ate breakfast, based upon the fact that DeLuca's medical chart created a timeline of what transpired with her upper and lower dentures. The upper dentures were removed for DeLuca's surgery and reinserted in the PACU. There was no indication in the chart that DeLuca's lower partial plate was ever removed. Kopplin also relied on the fact that DeLuca was awake, alert, and oriented when she was given her breakfast. Kopplin testified, based upon her experience with patients, that if DeLuca's dentures were not in her mouth, she would have asked for them and then that exchange would have been documented in DeLuca's chart. Kopplin opined, based upon her experience with elderly patients, that the first thing that they request when they wake up from anesthesia is their dentures. It is clear, then, that Kopplin's opinion was based upon the evidence that she reviewed in the record of this case, along with her experience treating elderly patients. At trial, Kopplin offered similar bases for her opinion. Kopplin said that, in addition to reviewing DeLuca's medical records, she had also reviewed the deposition testimony of all the witnesses in this case. She said that she had reached an opinion to a reasonable degree of medical certainty that DeLuca's lower partial plate and upper dentures were in DeLuca's mouth when she ate her breakfast on April 23, 2013. Specifically, in her many years as a PACU nurse, her experience was that postoperative patients who are transferred to the recovery room typically request their dentures before making any other request. Her opinion was based upon the entries in DeLuca's medical records noting that she was alert and oriented and on testimony that DeLuca always managed her own dentures. Kopplin saw no documentation in the medical records that DeLuca removed her lower partial plate. Kopplin's opinions were based upon her education, experience, and review of the medical records and depositions.

¶ 55        Oosterbaan also stated the bases for her opinion that DeLuca's lower partial plate was in place when she ate breakfast on April 23, 2013, both at her deposition and at trial. At her deposition, when asked whether she was speculating that both sets of dentures were in DeLuca's mouth when she ate breakfast, Oosterbaan testified that it was safe to say that the lower partial plate was in place, based upon the evidence and the medical records. At trial, Oosterbaan testified that it was her opinion that DeLuca's dentures were in her mouth when she ate breakfast. Again, her opinion was based upon both testimony and the medical records. Referencing DeLuca's medical chart, Oosterbaan testified that DeLuca went to the operating room with her upper dentures and lower partial plate in place, that Patseyevsky removed the upper dentures before DeLuca's surgery, packed them in a cup with DeLuca's name on it, and sent the cup to the PACU. Kraus then documented that she replaced DeLuca's upper dentures in her mouth.

¶ 56        We recognize that Oosterbaan erred when she said that Patseyevsky removed DeLuca's upper dentures before surgery, because Patseyevsky testified that DeLuca removed her upper dentures herself and handed them to her. Oosterbaan also erred when she testified that Kraus replaced DeLuca's upper dentures herself in the recovery room, because the record reflects that Kraus charted only "final comments, upper dentures in mouth." However, the issue here is not whether Condell's staff or DeLuca took her upper dentures out of her mouth or put them back in. Instead, our focus is on whether DeLuca had her dentures in her mouth when she ate breakfast and choked on April 23, 2013. Therefore, these minor errors do not persuade us that

- 11 -

the trial court abused its discretion in allowing Oosterbaan to testify as one of Condell's experts.

¶ 57    Oosterbaan also testified that there was no documentation that the lower dentures were taken out, only that they were in her mouth when she went to the operating room. Oosterbaan specifically testified that she was not speculating about what happened to the dentures and that her opinion was medical, and not personal.

¶ 58    It is abundantly clear that both Kopplin and Oosterbaan offered opinions that DeLuca's upper dentures and lower partial plate were in place when she ate her breakfast, and they both offered several bases for those opinions. Therefore, the trial court acted within its discretion when it allowed these experts to testify as to their opinions.

¶ 59                            B. Likosar's Evidence Deposition

¶ 60    Next, Caldwell argues that the trial court erred in admitting Likosar's evidence deposition. Specifically, she argues that Likosar's deposition should not have been admitted because (1) Condell failed to provide formal notice of Likosar's evidence deposition and (2) the trial court erred in sustaining Condell's objection to certain testimony on the ground of attorney-client privilege.

¶ 61                                Lack of Formal Notice

¶ 62    Caldwell contends that the videotaped evidence deposition was conducted by Condell's counsel without any notice, in violation of Illinois Supreme Court Rule 206(a) (eff. Feb. 16, 2011). Specifically, she states that her counsel objected to the evidence deposition on the record before that deposition began, and reiterated that objection prior to cross-examining Likosar. Counsel also filed a motion to bar the evidence deposition, which the trial court denied. Caldwell claims that, since Likosar appeared voluntarily and without objection, she was not under Condell's control. Finally, she contends, "[t]he hospital could have easily flown her back for live testimony, thus obviating any prejudice. The prejudice results from allowing this testimony via an unnoticed evidence deposition, [and] was compounded by the fact that defense counsel instructed the witness not to answer questions on cross-examination." Accordingly, Caldwell argues, the trial court abused its discretion in refusing to enforce Rule 206(a), and she must therefore be granted a new trial.

¶ 63    Rule 206(a) states, in relevant part:

> "(a) Notice of Examination; Time and Place. A party desiring to take the deposition of any person upon oral examination shall serve notice in writing a reasonable time in advance on the other parties. The notice shall state the time and place for taking the deposition; the name and address of each person to be examined, if known, or, if unknown, information sufficient to identify the deponent; and whether the deposition is for purposes of discovery or for use in evidence.
>
> ***
>
> (2) Audio-Visual Recording to be Used. If a party serving notice of deposition intends to record the deponent's testimony by use of an audio-visual recording device, the notice of deposition must so advise all parties to the deposition. If any other party intends to record the testimony of the witness by use of an audio-visual recording device, notice of that intent must likewise be served upon all other parties

a reasonable time in advance. Such notices shall contain the name of the recording-device operator. After notice is given that a deposition will be recorded by an audio-visual recording device, any party may make a motion for relief in the form of a protective order under Rule 201. If a hearing is not held prior to the taking of the deposition, the recording shall be made subject to the court's ruling at a later time." *Id.*

¶ 64 The decision to admit testimony is within the sound discretion of the trial court. See *Kamm*, 204 Ill. 2d at 24.

¶ 65 Here, Caldwell does a poor job of explaining exactly what kind of "formal notice" she did not receive for Likosar's evidence deposition. She admits that, approximately 30 to 45 days before trial, Condell's counsel informed her counsel that Likosar had retired from Condell and was now a resident of Arizona, and the parties discussed the necessity of an evidence deposition. Also, the record reflects that on February 9, 2016, Condell's counsel sent Caldwell's counsel an e-mail saying, "I want to set Likosar's evidence dep for my case for Friday, 2/12/16 at 10 a.m. at Condell. I think you said that works for you . . . can you confirm?" Caldwell's counsel responded that the date "work[ed] for Likosar." Caldwell's counsel then appeared at the evidence deposition on February 12, 2016. Since it is clear from the e-mails that Caldwell's counsel was made aware of the date of the evidence deposition in writing and agreed to the specific date, we fail to see how Condell violated Rule 206(a).

¶ 66 The only problem that Caldwell's counsel had with Likosar's evidence deposition is that he was not notified that it was going to be videotaped. However, Condell's counsel withdrew the videotape in light of Caldwell's objection. Since the videotape was not shown to the jury, we find no violation of Rule 206(a)(2).

¶ 67 C. Attorney-Client Privilege

¶ 68 Caldwell next argues that the trial court erred in denying her motion to bar Likosar's evidence deposition based upon the lack of attorney-client privilege between Likosar and Condell's counsel. Specifically, at the evidence deposition, Condell's counsel objected to Caldwell's questions about conversations between Likosar and Condell's counsel that occurred before that deposition. Caldwell claims that, since Likosar was no longer a Condell employee when her deposition was taken, she was not subject to the attorney-client privilege. Also, she claims that nurses who provide care for a patient are not part of the hospital's "control group," *i.e.*, they are not corporate decision-makers or employees who substantially influence corporate decisions, and therefore they cannot claim the attorney-client privilege. In addition, Caldwell argues that the insurer-insured privilege cannot apply here because no one was critical of Likosar's conduct in this case. Specifically, Likosar provided no care to DeLuca before DeLuca went into distress, the limitations period had run, and Likosar was never sued individually. Caldwell also contends that, since Likosar was not able to provide a factual basis for Condell's claim of attorney-client privilege, the admission of Likosar's evidence deposition was highly prejudicial.

¶ 69 Illinois Supreme Court Rule 201(b)(2) (eff. July 30, 2014) provides, in pertinent part:

"All matters that are privileged against disclosure on the trial, including privileged communications between a party *or his agent* and the attorney for the party, are privileged against disclosure through any discovery procedure." (Emphasis added.)

- 13 -

¶ 70    In order to determine which employees of a corporation enjoy the attorney-client privilege when communicating with an attorney on behalf of the corporation, Illinois applies the control-group test. *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill. 2d 103, 118-19 (1982). Under the control-group test, an employee whose advisory role to top management in a particular area is such that a final decision would not normally be made without his or her opinion, and whose opinion in fact forms the basis of any final decision by those with actual authority, is properly within the control group. *Id.* at 120. However, individuals who merely supply information to those in an advisory role are not members of the control group. *Id.* Only communications between an attorney and those in the control group are protected from disclosure. *Id.*

¶ 71    The attorney-client privilege is designed to promote and encourage open and frank consultation between a client and his or her attorney. *Pietro v. Marriott Senior Living Services, Inc.*, 348 Ill. App. 3d 541, 551 (2004). That privilege extends to communications between an insured and its insurer. *Holland v. Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560, ¶ 195. The basis for extending the privilege to an insurer is that the insured may properly assume that the communication is made to the insurer as an agent for the dominant purpose of transmitting it to an attorney for the protection of the interests of the insured. *Id.* "A nonparty insured may assert the attorney-client privilege if the insured made the statement at issue when 'the possibility existed that [the insured] would be made a defendant in lawsuits that might arise as a result of the [incident].'" *Exline v. Exline*, 277 Ill. App. 3d 10, 14 (1995). The party claiming the attorney-client privilege has the burden to present factual evidence establishing the privilege. *Pietro*, 348 Ill. App. 3d at 551. A trial court's determination of whether a privilege applies is reviewed *de novo*. *People v. McRae*, 2011 IL App (2d) 090798, ¶ 25.

¶ 72    We are not persuaded by Caldwell's arguments that the statements at issue here were not subject to the attorney-client privilege. First, Condell did not argue to the trial court, and does not argue on appeal, that a "control-group privilege" existed between Likosar and Condell. Second, it is very clear that Likosar was an agent of Condell and an insured under Condell's self-insured trust. Therefore, statements between Likosar and Condell were protected because of the insurer-insured relationship between them. Finally, the fact that Likosar retired weeks before her evidence deposition is completely irrelevant to her status as Condell's agent. Even if the limitations period for suing Likosar personally had run by the time of her evidence deposition, Likosar's actions could have given rise to vicarious liability on Condell's part.

¶ 73    For all these reasons, we find that the trial court did not err in denying Caldwell's motion to bar Likosar's evidence deposition.

¶ 74                    D. Application of the *Petrillo* Doctrine

¶ 75    Caldwell next contends that Condell's counsel violated the doctrine set out in *Petrillo*, 148 Ill. App. 3d 581, when counsel met with Likosar before Likosar's evidence deposition, on February 10, 2016. As support for this claim, Caldwell cites *Baylaender v. Method*, 230 Ill. App. 3d 610 (1992). However, Caldwell admits that she did not raise this issue until her posttrial motion.

¶ 76    *Petrillo* was a landmark decision on doctor-patient privilege. In *Petrillo*, the minor plaintiff filed a product liability suit against the defendant, alleging that he was injured from consuming one of its infant formulas. *Petrillo*, 148 Ill. App. 3d at 585. Against the trial court's order, defense counsel attempted to have an *ex parte* communication with one of the plaintiff's

- 14 -

treating doctors, and the trial court found counsel in contempt of court. *Id.* at 584. The appellate court found that *ex parte* communications between a plaintiff's treating doctor and defense counsel are barred as a matter of public policy because they compromise the sanctity of the doctor-patient relationship. *Id.* at 588. The court found that, in obtaining information or evidence, defense counsel is restricted to the "regular channels of discovery including, but not limited to, written interrogatories and depositions." *Id.* at 587. Four years later, in *Roberson v. Liu*, 198 Ill. App. 3d 332 (1990), the appellate court held that *ex parte* communications outside of authorized discovery channels are prohibited between an attorney and a party's treating nurse, just as they are prohibited between an attorney and a party's treating physician. *Id.* at 336.

¶ 77    In *Morgan v. County of Cook*, 252 Ill. App. 3d 947, 952 (1993), the appellate court subsequently recognized an exception to the *Petrillo* doctrine, allowing a hospital's attorneys to communicate *ex parte* with health care employees who were specifically alleged to be negligent and whose negligence the plaintiff sought to impute to the hospital. In *Morgan*, the court held that, if a plaintiff attempts to hold a hospital liable for the conduct of a hospital's own treating caregivers, "the defendant hospital is included within the physician-patient privilege and the patient has impliedly consented to the release of his medical information to the defendant hospital's attorneys." *Id.* at 954. The court reasoned that the " 'exclusion of the hospital from the physician-patient privilege would *** effectively prevent the hospital from defending itself by barring communication with the physician for whose conduct the hospital is allegedly liable.' " *Id.* at 953 (quoting *Ritter v. Rush-Presbyterian-St. Luke's Medical Center*, 177 Ill. App. 3d 313, 317-18 (1988)). Then, in *Burger v. Lutheran General Hospital*, 198 Ill. 2d 21 (2001), our supreme court adopted the reasoning in *Morgan* when the plaintiff made a *Petrillo* objection to *ex parte* communications between a hospital's counsel and the plaintiff's caregivers who had not been specifically named as defendants in the complaint, but for whose conduct the hospital could be potentially liable. The *Burger* court found that, if the hospital can communicate with the plaintiff's caregivers about the plaintiff's care before the commencement of a lawsuit, the filing of a lawsuit does not affect the nature of that information or the hospital's right or ability to access such information about the care and treatment rendered to the plaintiff at the hospital by its own caregivers. *Id.* at 58.

¶ 78    Here, we must first address Caldwell's admission that she failed to raise a *Petrillo* objection before or during trial, including before or during Likosar's discovery or evidence deposition. Instead, Caldwell raised this issue for the first time in her posttrial motion.

¶ 79    Generally, a failure to object contemporaneously to an alleged error results in forfeiture. *Matthews v. Avalon Petroleum Co.*, 375 Ill. App. 3d 1, 8 (2007). Nevertheless, this court has the authority to overlook a party's forfeiture of an issue and instead address its merits. See *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 504-05 (2002). A reviewing court may consider a forfeited argument particularly where, as here, the issue is a legal one and is fully briefed by the parties on appeal. See *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1, 11 (1996). For these reasons, we will overlook Caldwell's forfeiture of this issue.

¶ 80    It is clear that no *Petrillo* violation occurred when Condell's counsel spoke to Likosar prior to her evidence deposition. In Caldwell's complaint, she alleged that the nurses and PCTs on 2-West failed to monitor DeLuca postoperatively, failed to ensure that she was sufficiently recovered from surgery to consume food, and negligently allowed her to eat without ensuring that her dentures were in place. Likosar was the nurse manager on duty on 2-West when

DeLuca choked on her breakfast, and Likosar was the person who swept DeLuca's mouth and attempted to clear her airway, albeit unsuccessfully, after she choked. Although Caldwell did not name any nurses in her complaint, her allegations of negligence related to the nurses' actions during Likosar's shift as nurse manager on 2-West. Under those circumstances, both *Morgan* and *Burger* support the conclusion that an exception to the *Petrillo* doctrine applied here.

¶ 81　　We are not persuaded by Caldwell's reliance on *Baylaender* to support her claim that a *Petrillo* violation occurred here. In *Baylaender*, the decedent's estate and her husband brought a survival and wrongful death action against Dr. Method for his failure to correctly diagnose the decedent's cancer. The decedent's subsequent treating physician, Dr. Southwick, discussed the decedent's case with an attorney assigned to represent him by his insurance carrier, although he was not being sued. That same attorney was later assigned by the insurance carrier to represent Dr. Method. The plaintiffs appealed the trial court's denial of their motion *in limine* to bar Dr. Southwick's testimony. On appeal, the court found that *ex parte* discussions between a treating physician and an attorney who ultimately represents the defendant in a medical malpractice action violate the principles set forth in *Petrillo*. *Baylaender*, 230 Ill. App. 3d at 625-26.

¶ 82　　The unique facts in *Baylaender* are not like the facts in this case. In *Baylaender*, no agency relationship existed between Dr. Method and Dr. Southwick, and neither physician could be held vicariously liable for the actions of the other. As we have noted, Condell could have been held vicariously liable for Likosar's actions, she was the nurse manager on 2-West at the time of DeLuca's death, and the allegations in Caldwell's complaint, even though Likosar was not named personally, directly related to the nurses' actions on 2-West before DeLuca's death. For all these reasons, we find that the *Petrillo* doctrine was not violated when Condell's counsel talked to Likosar before her evidence deposition.

¶ 83　　　　　　　　　　　　E. IPI Civil No. 5.01

¶ 84　　Finally, Caldwell argues that the trial court erred in denying her request for a "missing witness" jury instruction. Specifically, she argues that, over her objection, Likosar was allowed to speculate that the PCT who prepared DeLuca's body could have removed the lower partial plate from DeLuca's mouth. However, Caldwell claims, no PCT was ever identified as the individual who prepared DeLuca's body, even though that unknown individual was under Condell's control. Under these circumstances, she argues, the trial court abused its discretion in refusing to give IPI Civil No. 5.01.

¶ 85　　IPI Civil No. 5.01 provides:

　　　　"5.01 Failure To Produce Evidence or A Witness

　　　　If a party to this case has failed [to offer evidence] [to produce a witness] within his power to produce, you may infer that the [evidence] [testimony of the witness] would be adverse to that party if you believe each of the following elements:

　　　　　　1. The [evidence] [witness] was under the control of the party and could have been produced by the exercise of reasonable diligence.

　　　　　　2. The [evidence] [witness] was not equally available to an adverse party.

- 16 -

3. A reasonably prudent person under the same or similar circumstances would have [offered the evidence] [produced the witness] if he believed [it to be] [the testimony would be] favorable to him.

4. No reasonable excuse for the failure has been shown."

¶ 86 Whether to give IPI Civil (2011) No. 5.01 is a matter within the sound discretion of the trial court. *Dunning v. Dynegy Midwest Generation, Inc.*, 2015 IL App (5th) 140168, ¶ 84.

¶ 87 After a careful review of the record, we find that IPI Civil No. 5.01 was not warranted because Caldwell never established that there was a missing witness. First, Likosar testified that PCTs performed postmortem care but that she did not know which PCT provided such care to DeLuca. Second, at the jury instruction conference, Caldwell argued that Dockery testified that there were two PCTs on 2-West during her shift. However, Dockery worked the night shift, not the day shift, which was when someone provided postmortem care. Third, Riek testified that she worked the day shift on April 23, 2013, and that she cared for DeLuca before she choked. However, *Riek was never asked whether she provided postmortem care to DeLuca*. Based upon Likosar's and Riek's testimony, it was reasonable for the jury to infer that Riek was the PCT who provided DeLuca's postmortem care and that, therefore, there was no missing witness. For these reasons, the trial court did not abuse its discretion in denying Caldwell's request for IPI Civil No. 5.01.

¶ 88                                          III. CONCLUSION

¶ 89 In sum, the trial court did not err in allowing Oosterbaan and Kopplin to testify as expert witnesses for Condell, when their testimony was not speculative and instead was based on the medical records in this case, their professional experience, and the deposition testimony of other witnesses. Also, no violation of Rule 206(a) occurred, when the record reflects that Caldwell's counsel agreed to the date for Likosar's evidence deposition, and Rule 206(a)(2) was not violated because Condell's counsel withdrew the videotape of that deposition before trial began, in light of Caldwell's objections.

¶ 90 We also reject Caldwell's argument that the attorney-client privilege did not exist between Likosar and Condell's counsel because Likosar was an agent of Condell and an insured under Condell's self-insured trust, and the fact that Likosar retired before her evidence deposition was irrelevant to her status as Condell's agent. We find no violation of the *Petrillo* doctrine when Condell talked to Likosar before her evidence deposition, based upon the analyses and holdings in *Morgan*, 252 Ill. App. 3d 947, and *Burger*, 198 Ill. 2d 21. Finally, we hold that the trial court did not abuse its discretion in refusing to give the jury a "missing witness" instruction, when the testimony offered at trial did not establish that Condell failed to produce a witness.

¶ 91 For all these reasons, the judgment of the circuit court of Lake County is affirmed.

¶ 92 Affirmed.