# Illinois Official Reports

## Appellate Court

---

**Bedin v. Northwestern Memorial Hospital, 2021 IL App (1st) 190723**

---

| | |
|---|---|
| Appellate Court Caption | JANET BEDIN, Plaintiff-Appellant, v. NORTHWESTERN MEMORIAL HOSPITAL, Defendant-Appellee. |
| District & No. | First District, Sixth Division<br>No. 1-19-0723 |
| Filed | April 9, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 18-L-3315; the Hon. Margaret Ann Brennan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Deidre Baumann, of Baumann & Shuldiner, of Chicago, for appellant.<br><br>Sandra G. Iorio and Catherine Ó Súilleabháin, of Anderson, Rasor & Partners, LLP, of Chicago, for appellee. |
| Panel | JUSTICE CONNORS delivered the judgment of the court, with opinion.<br>Presiding Justice Mikva and Justice Harris concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff, Janet Bedin, appeals from the circuit court's order that granted defendant Northwestern Memorial Hospital's (Northwestern) section 2-619 motion (735 ILCS 5/2-619 (West 2018)) to dismiss her amended complaint for intentional infliction of emotional distress based on the absolute litigation privilege. On appeal, plaintiff contends that defendant failed to establish that the communications at issue were subject to the absolute litigation privilege. She argues that defendant did not provide any evidence that the statements at issue were made to plaintiff before and in contemplation of the guardianship proceeding. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    In September 2010, plaintiff's mother, Dolores Bedin, was admitted to Northwestern and subsequently diagnosed with pancreatic cancer.[1] Plaintiff, individually, and as executrix of the estate of Dolores Bedin (decedent), and Janet Bedin's brother, Alexander Bedin, filed a complaint against defendant and various physicians that alleged claims for intentional infliction of emotional distress (IIED) and abuse of process relating to defendant's conduct when Dolores was admitted to Northwestern in September 2010.[2] The circuit court granted defendant's motion to dismiss the amended complaint based on the statute of limitations. On appeal, we affirmed the circuit court's dismissal of the abuse of process claim and the IIED claims filed by Alex and Dolores's estate, but we remanded for further proceedings on Janet's IIED claim. *Bedin v. Northwestern Hospital*, 2017 IL App (1st) 151547-U, ¶ 49.

¶ 4                          A. Background Before First Appeal

¶ 5    Our previous decision, *Bedin*, 2017 IL App (1st) 151547-U, set forth in detail the facts leading up to that appeal. The following is a limited recitation of the previous case history in addition to the facts necessary to understand the background and progression of this case since the initial appeal.

¶ 6    On November 13, 2012, Janet, individually, and on behalf of Dolores's estate, and Alexander filed a complaint against defendant, certain physicians, and other healthcare professionals that alleged various claims, including abuse of process and IIED. On March 26, 2013, Janet, individually, and on behalf of the Dolores's estate, and Alexander filed an amended complaint only against defendant and alleged claims for abuse of process and IIED.

¶ 7    Janet, Dolores's estate, and Alexander alleged as follows. On September 1, 2010, Dolores had severe episodes of vomiting and was taken to defendant's emergency department. Defendant informed Dolores that a computed tomography scan from April 2010 indicated that she had pancreatic cancer. On September 15, 2010, Dolores could not walk without assistance. On that same day, a physician at Northwestern informed Janet that Dolores could walk without assistance and that, therefore, Medicare would no longer pay for her hospitalization. Representatives from Northwestern also told Janet that Medicare would not reimburse any

---

[1] In April 2018, the circuit court approved the parties' settlement agreement with respect to plaintiffs' medical negligence action against defendant.

[2] Plaintiff, Janet Bedin; her brother, Alexander Bedin; and her mother, Dolores Bedin, share the same last name. We will therefore refer to them by their first names.

acute rehabilitation, that defendant would charge $2500 per day if Janet and Dolores did not agree to defendant's discharge recommendation, and that Dolores's home would be taken away from her to pay her hospital bill. On September 28, 2010, representatives from Northwestern met with Janet regarding Dolores's discharge and told her, among other things, that "we checked with our attorneys and if you don't take your mother out of the hospital we are going to take her away from you" and "we will have a Public Guardian assigned to make all decisions for her [Dolores] and you [(Janet)] will not be involved in her [(Dolores's)] care." On October 22, 2010, in the circuit court of Winnebago County, defendant filed a petition for temporary guardianship of Dolores and a petition for appointment of a guardian for a disabled person. Defendant also filed a petition to invalidate, suspend, and/or revoke Janet's power of attorney.

¶ 8      Janet, Dolores's estate, and Alexander alleged claims for abuse of process and IIED. With respect to the abuse of process claim, they alleged as follows. Defendant filed the petitions in the guardianship proceeding "with the improper purpose of coercing, harassing and intimidating Janet, Dolores[,] and Alexander to acquiesce to the Discharge Recommendation despite the Disagreement." Janet, Dolores, and Alexander were damaged by defendant's conduct because it caused Janet to hire a lawyer and personal caregivers while Dolores was in the hospital. With respect to the IIED claim, they alleged that defendant conducted itself in an extreme and outrageous manner that went beyond all possible bounds of decency when it, *inter alia*, filed petitions in the guardianship proceeding for the improper purpose of coercing, harassing, and intimidating Janet, Dolores, and Alexander to acquiesce to the discharge recommendation.

¶ 9                              B. Documents in Common-Law Record

¶ 10     The common-law record contains various documents that were attached to the original and amended complaints as well as defendant's motion to dismiss filed in the initial action before the first appeal. We will summarize some of those documents below.[3]

¶ 11     A September 20, 2010, letter addressed to Dolores from IFMC-IL, a quality improvement organization authorized by Medicare to review inpatient services provided to Medicare patients, stated that Janet had contacted IFMC-IL on September 15, 2010, because she was concerned Dolores was being discharged too soon. The letter stated that IFMC-IL agreed with defendant's discharge plan and that the physician reviewer found it was appropriate for Dolores to be discharged from an inpatient level of care. The letter informed Dolores that she would be responsible for any payments not covered by Medicare and that defendant may send her a bill for any services provided to her starting September 18, 2010.

¶ 12     There is also an undated letter addressed to Janet and signed by Northwestern physicians Dr. Stevie Mazyck and Dr. Joseph Munsayac, which stated as follows:

> "Your mother has been medically cleared to be discharged as an Inpatient at Northwestern Memorial Hospital since Sept. 15, 2010. You filed an appeal to Medicare and were denied the appeal to your mother's discharge. Since that time the care team has made multiple attempts to arrange for her safe discharge with you the designated decision make[r]. We met on Sept. 28 and presented the discharge plan to you for

---

[3]The exhibits attached to the original and amended complaints filed in the original action, including the petitions filed in the guardianship action, were not attached to Janet's complaint for IIED that is the subject of this appeal.

review. At that time you refused the plan for discharge and insisted that your mother is not ready to go home and cannot function without 24 hour care. You are requesting that Northwestern Memorial Hospital provide 24 hour care for your mother and are refusing to facilitate discharge for your mother."

In the letter, the physicians also stated: "Since your mother defers all of her medical decision making to you and you have been unable or unwilling to assist her in this discharge, we plan to file for a court appointed guardian to be assigned to your mother to help facilitate her discharge."

¶ 13   Defendant's petitions filed in the guardianship proceeding in Winnebago County as well as the guardian *ad litem* (GAL) report are also included in the common-law record. Defendant's petition for a temporary guardian stated that Dolores was a patient at Northwestern and had been ready for discharge since September 18, 2010. The petition stated that Dolores appointed Janet as power of attorney on September 28, 2010, that Janet and Dolores refused to participate in the discharge plan, and that a temporary guardian was necessary to effect discharge planning and placement. Defendant's petition to invalidate, suspend, and/or revoke the power of attorney alleged as follows. Dolores had been ready for discharge since September 18, 2010. On September 28, 2010, Dolores executed a power of attorney for healthcare appointing Janet, who refused to participate with professional staff to make the appropriate discharge plan for Dolores. Janet put Dolores at an increased risk of infection due to unnecessary continued hospitalization.

¶ 14   The report of the GAL, who was appointed to evaluate whether the appointment of a permanent guardian was appropriate, was filed on November 9, 2010. The report stated: "Dolores is oriented as to person, place, time and situation. I do not at this point, believe that Dolores needs a guardian, but I also believe that based on all the information of which I am aware, Dolores does not need to be in the hospital." The GAL concluded that defendant's "only interest is in getting Dolores out of the hospital" and that Janet was "an appropriate person to make the decisions for Dolores, however, I believe in this particular case, concerning the placement of Dolores, Janet may be trying to get something from the hospital, that the hospital may not be willing to provide."

¶ 15   The orders entered in the guardianship proceeding in the circuit court of Winnebago County are also included in the common-law record. On November 9, 2010, the circuit court in Winnebago County entered an order stating that the parties agreed that Dolores would be discharged from Northwestern on November 12, 2010, and that Northwestern would provide at-home care for 14 days following her discharge. Thereafter, on December 2, 2012, the court entered an order stating that it denied Janet's motion to vacate the November 9, 2012, order and that the case was closed.

¶ 16                     C. Defendant's Motion to Dismiss

¶ 17   Defendant filed a section 2-619.1 motion to dismiss (735 ILCS 5/2-619.1 (West 2012)) the amended complaint from Janet, Dolores's estate, and Alexander, arguing, *inter alia*, that the two-year statute of limitations for abuse of process and IIED claims barred their claims. The court subsequently granted defendant leave to file a supplemental brief in support of its motion to dismiss, in which it argued that the IIED claim was also barred by the absolute litigation privilege.

¶ 18    The circuit court granted defendant's motion to dismiss. In doing so, it found that the two-year statute of limitations for Janet, Dolores's estate, and Alexander's claims started to run when the agreed order in the guardianship proceeding was entered on November 9, 2010, and that they did not file their complaint until over two years later on November 13, 2012. The circuit court did not address defendant's argument regarding the absolute litigation privilege. The circuit court also stated that it "was deeply troubled by this attempt to collaterally attack the guardianship proceeding" and that Janet, Dolores's estate, and Alexander's arguments were "based on [the] belief that the guardianship was improperly brought by Northwestern." Janet, Dolores's estate, and Alexander appealed.

¶ 19                    D. First Appeal: *Bedin v. Northwestern Hospital*,
                        2017 IL App (1st) 151547-U

¶ 20    On appeal, we affirmed the circuit court's ruling that Janet, Dolores's estate, and Alexander's abuse of process claim was barred by the two-year statute of limitations. *Bedin*, 2017 IL App (1st) 151547-U, ¶ 23. We concluded that their claim for abuse of process was based entirely on grievances that arose as a result of the guardianship action and that, therefore, the last act that could have given rise to the cause of action occurred on the date that defendant filed the petition in the guardianship action, which was October 22, 2010. *Id.* Therefore, because Janet, Dolores's estate, and Alexander filed their complaint more than two years later, on November 13, 2012, we found that the abuse of process claim was barred by the statute of limitations. *Id.* ¶¶ 17, 23.

¶ 21    With respect to the IIED claims brought by Alexander and Dolores's estate, we affirmed the circuit court's dismissal order, concluding that the two-year statute of limitations had expired by the time they filed their complaint on November 13, 2012. *Id.* ¶¶ 29-30. We noted that they did not allege that defendant made any threats to Alexander after the discharge date of November 12, 2010, or that defendant made any threats to Dolores after the agreed order in the guardianship action was entered on November 9, 2010. *Id.*

¶ 22    However, with respect to Janet's IIED claim, we reversed the circuit court's ruling. *Id.* ¶ 32. We noted that Janet, Dolores's estate, and Alexander stated in their brief on appeal that they had pled in their complaint that defendant's outrageous conduct continued outside the hospital and that, to support this statement, they cited Janet's affidavit attached to their response to defendant's motion to dismiss. *Id.* ¶ 27. In Janet's affidavit, she averred that defendant made additional threats to her on the date of her discharge, which was November 12, 2010, as well as at the final hearing in the guardianship proceeding, which was December 2, 2010. *Id.* We concluded that, under the motion to dismiss standard, the circuit court was "obligated to accept that threats to Janet were made on the date of discharge, and to Janet on December 2, 2010," and that, taking the allegations as true, "a question of fact remains as to when the statute of limitations accrued for Janet's IIED claim, which should be resolved by the trial court." *Id.* ¶ 28. We therefore reversed and remanded for further proceedings as to Janet's IIED claim only. *Id.* ¶ 32.

¶ 23              E. Proceedings in the Circuit Court After First Appeal
¶ 24    On remand, Janet filed an amended complaint against defendant for IIED, which contained similar allegations as the amended complaint filed in March 2013. She alleged as follows. At all relevant times, Janet had a valid power of attorney appointing her as Dolores's agent for

medical decisions.[4] When Dolores was in the hospital in September 2010, Janet and Dolores expressly objected to defendant's discharge recommendation because they knew it was unsafe for her and she needed rehabilitation. On September 15, 2010, Dr. Mazyck,[5] a hospitalist at Northwestern, told Janet that Dolores could walk without assistance and, as a result, Medicare would no longer pay for her hospitalization and that Dolores must be discharged to her home. On this same day, "representatives" of Northwestern, including Dr. Mazyck, told Janet that Dolores did not meet the Medicare criteria for reimbursement, Medicare would not reimburse any acute rehabilitation because Dolores could walk, Northwestern would charge Dolores $2500 per day if Dolores and Janet did not agree to the discharge recommendation, and Dolores's home would be taken away from her to pay Northwestern's bill.

¶ 25    Janet further alleged that on September 28, 2010, nine "representatives" from Northwestern met with her and made the following statements: "we have powerful attorneys and we have a lot of money to pursue this"; "we are going to take your mother away from you"; "we checked with our attorneys and if you don't take your mother out of the hospital we are going to take her away from you"; "we are going to have a Hospitalist document that Dolores is incompetent"; "we will have a Public Guardian assigned to make all decisions for her [Dolores] and you [Janet] will not be involved in her [Dolores's] care"; "we will have your mother's home sold and our [sic] mother will die in a nursing home alone in south Chicago"; and "we will have your power of attorney revoked on the basis that you [Janet] don't have Dolores'[s] best interests at heart because you are keeping her in the hospital where there are germs and bacteria and you will never see her again." Janet alleged that at this meeting, Northwestern "staff" "threatened to place [Alexander] in a Chicago home for 'retarded adults' to have Alexander 'activated' at that home 'right away' " and that the staff told her "that Alexander would never see Janet or Dolores, and that he would [be] controlled by a public guardian."

¶ 26    Janet alleged that participants in the meeting included Dr. Mazyck, Dr. Munsayac, Denise Anderson, Mara Unterberger, and Lisa MacMahon, who were acting in the course of their perceived duties and responsibilities as defendant's employees. Plaintiff alleged that, after the meeting, defendant's "staff members," which included Anderson, Unterberger, and MacMahon, showed Alexander, Janet, and Dolores a document "from the internet showing a group home that housed children with Down Syndrome and said [defendant] was going to send [Alexander] to that home."

¶ 27    Janet further alleged as follows. On September 28, 2010, defendant sent Janet a letter signed by Dr. Mazyck and Dr. Munsayac informing her about defendant's plan to discharge Dolores. The letter stated: "Since your mother defers all of her medical decision making to you and you have been unable or unwilling to assist her in this discharge, we plan to file for a court-appointed Public Guardian to be assigned to your mother to help facilitate her discharge." The letter was intentionally false and misleading because Janet was neither unable nor unwilling to assist in Dolores's discharge.

---

[4]In Janet's original complaint filed in November 2012, she alleged that Dolores appointed her as power of attorney on September 28, 2010. Specifically, she stated: "On September 28, 2010, Dolores asked for a Power of Attorney form and appointed Janet as her agent."

[5]Janet's complaint for IIED spells the physician's last name as "Myzack" and "Mazyck." The letter to Janet from Dr. Mazyck attached to the original complaint was signed as "Dr. Stevie Mazyck." We will therefore spell his name as "Dr. Mazyck."

- 6 -

¶ 28    Janet alleged that on October 22, 2010, on behalf of defendant, Unterberger filed a petition for appointment of a guardian of Dolores's estate and person as well as a petition to invalidate, suspend, and/or revoke Janet's power of attorney. As previously discussed, Janet had attached the petitions to her original complaint but did not attach the petitions to her complaint for IIED that is the subject of this appeal. Janet alleged that on October 24, 2010, Dr. Bijal Jain, a hospitalist at Northwestern, tried to persuade Dolores to cancel Janet's power of attorney and made the following statements to Dolores: "your daughter checked off on the power of attorney that you wanted to have everything done"; "Do you want to die on a machine?"; and "Don't you want to die in peace instead of on a machine?" Janet alleged that Dr. Jain made these statements with the intent for Janet to hear them and cause Janet further emotional distress so that she "would accede to [defendant's] efforts to discharge a patient Medicare somehow determined to need no further hospital services."

¶ 29    Janet further alleged that, when Dolores was "an in-patient" in the hospital, Northwestern "staff and representatives," including Anderson, McMahon, and Unterberger, made certain threats to Janet, which included, *inter alia*, that defendant "had powerful attorneys that could destroy her"; defendant "would find 'things' in her past" and if it failed to find "things" in the past, defendant "would fabricate such 'things' and would make the resulting lies public"; defendant "would cause a Public Guardian to make all decisions for Dolores"; "Dolores would not see Janet or Alexander again"; "Dolores would never see her home in Rockford, Illinois again because it would be sold"; defendant "would cause Dolores to [be] placed in a nursing home in South Chicago, and would leave her there until she died, and Janet would not know Dolores was dead until after the fact"; defendant "had begun to make arrangements to remove Alexander from his own home outside the NMH hospital and have him placed in a group home for 'retarded adults' or adults with Down Syndrome"; defendant would "arrest Alexander for criminal trespass for spending evenings in his dying mother's hospital room, despite the fact that the room in which [defendant] housed Dolores contained a sofa bed whose purpose is to facilitate family members staying overnight with patients"; and defendant "would have a Sheriff arrest Dolores, evict her from the hospital and put her on the street in a wheelchair."

¶ 30    Janet alleged that "prior to Dolores'[s] discharge," Dr. Mazyck and another physician, Dr. Noskins, whom she stated acted on behalf of defendant, falsely told Janet that Dolores could walk and was incompetent and threatened her "by saying the discharge team was in control, and that Janet would never see Dolores again unless Janet cooperated with the discharge team in discharging Dolores from the hospital." She alleged that "prior to Dolores'[s] discharge," Dr. Munsayac told Janet that Dolores would be removed from her family, would have to sell her house to pay for her care at Northwestern because she was not entitled to Medicare, and would be moved to a nursing home unless Dolores and Janet cooperated in discharging Dolores from the hospital. Janet alleged that "prior to Dolores'[s] discharge," Dr. Jain told Dolores that she would be taken away if she did not agree to leave the hospital.

¶ 31    Janet further alleged that Dolores was discharged from the hospital on November 12, 2010, pursuant to an agreed order. Defendant and "its attorneys continued to make threats on and after November 12, 2010," and the guardianship action proceeded until at least December 2, 2010. Defendant filed the petition in the guardianship action "with the improper purpose of coercing[,] harassing[,] and intimidating Janet, Dolores[,] and Alexander to acquiesce in Defendant's proposed Discharge Recommendation despite their objections." Defendant's actions "were of an extreme and outrageous nature that went beyond all possible bounds of

decency when they used their dominant position in their relationship with plaintiff for the improper purpose of coercing, harassing[,] and intimidating her to acquiesce to their plans to release Dolores from the hospital without rehabilitative treatment." As a direct and proximate result of defendant's extreme and outrageous behavior, Janet suffered severe emotional distress.

¶ 32                                    F. Defendant's Motion to Dismiss

¶ 33        Defendant filed a section 2-619 motion to dismiss, arguing that Janet's IIED claim was barred by the absolute litigation privilege. Defendant asserted that Illinois adopted sections 586 and 587 of the Restatement (Second) of Torts, which provide an absolute litigation privilege for parties to litigation for statements made that are relevant or bear some relation to the subject in controversy. Restatement (Second) of Torts §§ 586, 587 (1977). Defendant argued that Janet's IIED claim was barred because it was based entirely on defendant filing the petitions in the guardianship action in Winnebago County and on its conduct within the context of that guardianship action. Defendant did not argue that the statute of limitations barred Janet's IIED claim.

¶ 34        The circuit court granted defendant's motion to dismiss, concluding that the absolute litigation privilege applied to Janet's IIED claim. In the court's written order, it stated:

> "The communications at issue were made either pursuant to the guardianship litigation, or prior to and in contemplation of the guardianship litigation, as demonstrated by the allegations in the Complaint representatives of the Hospital told Plaintiff that they had powerful attorneys and would revoke her power of attorney. As the alleged communications and conduct were performed either by Hospital employees or their attorneys in anticipation of or pursuant to litigation, the absolute litigation privilege applies."

The circuit court subsequently denied Janet's motion to reconsider. This appeal followed.

¶ 35                                            II. ANALYSIS

¶ 36        On appeal, Janet contends that defendant failed to establish that the communications at issue were subject to the absolute litigation privilege. She argues that defendant did not offer evidence to show that the statements were made pursuant to the guardianship litigation or prior to and in contemplation of that action. She asserts that the circuit court had no basis to conclude that the litigation privilege barred her entire IIED claim where some of the allegations might be protected by the litigation privilege but many other facts in support of her claim were not pertinent to or in furtherance of the guardianship action.

¶ 37        As an initial matter, defendant responds that Janet's IIED claim is barred by both the absolute litigation privilege as well as the two-year statute of limitations. It asserts that Janet based her IIED claim primarily on allegations that occurred before Dolores was discharged on November 12, 2010, and that Janet did not file her complaint until over two years later on November 13, 2012. Defendant asserts that Janet failed to plead in her amended complaint for IIED that defendant engaged in any tortious conduct on or after November 13, 2010. However, defendant did not argue in the circuit court that Janet's IIED claim was barred by the statute of limitations. Thus, it forfeited the argument. See *Fox v. Heimann*, 375 Ill. App. 3d 35, 45 (2007)

("the expiration of a statute of limitations is an affirmative defense, which is forfeited if not timely raised in the trial court").

¶ 38 Defendant's motion to dismiss based on the absolute litigation privilege was brought under section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2018)). A motion to dismiss brought under section 2-619 "admits the legal sufficiency of the complaint but asserts a defense that defeats it." *Doe v. University of Chicago Medical Center*, 2015 IL App (1st) 133735, ¶ 35. Under section 2-619(a)(9), dismissal of a complaint is proper where "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2018). When ruling on a section 2-619 motion, "a court must accept as true all well-pleaded facts, as well as any reasonable inferences that may arise from them." *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31. However, "a court cannot accept as true mere conclusions unsupported by specific facts." *Id.* Our review of a circuit court's dismissal of a complaint under section 2-619 is *de novo*. *Doe*, 2015 IL App (1st) 133735, ¶ 35.

¶ 39 The absolute litigation privilege is an affirmative defense that may be raised and determined in a motion to dismiss brought under section 2-619. *Johnson v. Johnson & Bell, Ltd.*, 2014 IL App (1st) 122677, ¶ 15. Under section 586 of the Restatement (Second) of Torts, an attorney is "absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding." Restatement (Second) of Torts § 586 (1977). Section 587 of the Restatement (Second) of Torts provides that a private party to the litigation "enjoys the same privilege concerning a proceeding to which he is a party." *Johnson*, 2014 IL App (1st) 122677, ¶ 15 (citing Restatement (Second) of Torts § 587 (1977)).

¶ 40 The privilege applies to all communications made before, during, or after litigation (*O'Callaghan v. Satherlie*, 2015 IL App (1st) 142152, ¶ 26) and applies "regardless of the defendant's motive or the unreasonableness of his conduct" (*Johnson*, 2014 IL App (1st) 122677, ¶ 15). The only requirement for the litigation privilege to apply "is that the communication must pertain to proposed or pending litigation." *Scarpelli v. McDermott Will & Emery LLP*, 2018 IL App (1st) 170874, ¶ 19. However, the pertinency requirement is not strictly applied. *O'Callaghan*, 2015 IL App (1st) 142152, ¶ 25. The privilege applies to statements that are " 'relevant, pertinent, or bear some relation to the subject in controversy.' " *Medow v. Flavin*, 336 Ill. App. 3d 20, 31 (2002) (quoting *Defend v. Lascelles*, 149 Ill. App. 3d 630, 639-40 (1986)). The privilege applies "even where the defamatory statement is not confined to specific issues related to the litigation." *Malevitis v. Friedman*, 323 Ill. App. 3d 1129, 1131 (2001). If we have any doubts regarding pertinency, we must resolve them "in favor of finding the communication pertinent to the litigation." *Doe v. Williams McCarthy, LLP*, 2017 IL App (2d) 160860, ¶ 19. We review *de novo* the issue of whether a particular statement is privileged. *Malevitis*, 323 Ill. App. 3d at 1131. Further, we have previously found that the litigation privilege applies to IIED claims. *O'Callaghan*, 2015 IL App (1st) 142152, ¶¶ 26-27.

¶ 41 Applying the principles above to this case, we conclude that defendant's statements and conduct were sufficiently related to the guardianship action such that the absolute litigation privilege applies and bars Janet's claim for IIED.

¶ 42    The record shows that by September 15, 2010, defendant had prepared a discharge recommendation for Dolores and informed Janet that Dolores would be responsible for payments not covered by Medicare. Janet had expressly objected to defendant's discharge recommendation, and at Janet's request, an organization that reviews inpatient services provided to Medicare patients subsequently reviewed the case and agreed with defendant's discharge plan. On October 22, 2010, defendant filed a petition for a temporary guardian, alleging that "Janet and Dolores refused to participate in the discharge plan, and that a temporary guardian was necessary to affect discharge planning and placement." Defendant also filed a petition to invalidate, suspend, and/or revoke Janet's power of attorney, which stated that Dolores had been ready for discharge since September 18, 2010, that Janet refused to participate with professional staff to make the appropriate discharge plan for Dolores, and that Janet was putting Dolores at an increased risk of infection due to unnecessary continued hospitalization. When viewed in this context, defendant's statements and conduct as set forth in Janet's amended complaint for IIED were sufficiently related and pertinent to the guardianship action, which defendant thought was "necessary to affect discharge planning and placement."

¶ 43    On appeal, Janet specifically takes issue with defendant's statements made on September 15, 2010, September 28, 2010, and October 24, 2010. With respect to defendant's statements made on September 15, 2010, Janet alleged that defendant's "representatives," including Dr. Mazyck, told Janet that Dolores did not meet the Medicare criteria for reimbursement, that Northwestern would charge Dolores $2500 per day if Dolores and Janet did not agree to the discharge recommendation, and that Dolores's home would be taken away from her to pay Northwestern's bill. Janet asserts that there is nothing to suggest that these statements were made prior to and in contemplation of a possible guardianship filing. We disagree. Given that Janet was expressly objecting to Dolores's discharge, we find that these statements regarding the Medicare reimbursement issues and financial consequences for Dolores if Dolores remained in the hospital were made in contemplation of the possibility of filing a future guardianship action to determine whether a temporary guardian was necessary for the welfare and protection of Dolores. See *Scarpelli*, 2018 IL App (1st) 170874, ¶ 29 (stating that the only requirement for the privilege to apply "is that the statements are pertinent to a possible future legal proceeding"). As previously discussed, defendant is not liable for statements that have any bearing to the guardianship action regardless of its motive or the unreasonableness of its conduct.

¶ 44    Further, with respect to defendant's statements made at the September 28, 2010, meeting, Janet alleged that "representatives" told her, *inter alia*, that "we have powerful attorneys and we have a lot of money to pursue this"; "we checked with our attorneys and if you don't take your mother out of the hospital we are going to take her away from you"; "we are going to have a Hospitalist document that Dolores is incompetent"; "we will have a Public Guardian assigned to make all decisions for her [Dolores] and you [Janet] will not be involved in her [Dolores's] care"; and "we will have your mother's home sold and our [*sic*] mother will die in a nursing home alone in south Chicago." From our review, we find that defendant's statements at this meeting were clearly related and pertinent to a potential guardianship action and how that action could impact Janet and her family, *i.e.*, a public guardian would be appointed and the guardian, not Janet, would make decisions for Dolores. Further, Janet acknowledges that as of September 28, 2010, defendant was contemplating filing the guardianship action. Janet

alleged that on this date, defendant sent a letter to her, which stated that "[s]ince your mother defers all of her medical decision making to you and you have been unable or unwilling to assist her in this discharge, we plan to file for a court appointed Public Guardian to be assigned to your mother to help facilitate her discharge."

¶ 45 Janet alleged that on October 24, 2010, which was two days after defendant filed the guardianship petitions, a hospitalist physician tried to persuade Dolores to cancel Janet's power of attorney and told Dolores with the intent for Janet to hear that "your daughter checked off on the power of attorney that you wanted to have everything done"; "Do you want to die on a machine?"; and "Don't you want to die in peace instead of on a machine?" These statements and the attempt to persuade Dolores to cancel Janet's power of attorney were directly related to the pending guardianship action in which defendant sought to suspend and/or revoke Janet's power of attorney.

¶ 46 Accordingly, from our review of the record, we find that defendant's statements were made in contemplation of filing and during the pending guardianship action and were related and pertinent to that proceeding. Thus, the absolute litigation privilege applies and bars Janet's IIED claim.

¶ 47 Janet asserts that she "would not have been a 'party' to the guardianship as she was not subject to the petition for guardianship or served with any summons and therefore, would not be precluded by the litigation privilege from recovery." However, Janet does not provide authority to support that, in order for the absolute litigation privilege to apply, she must have been a party to the guardianship proceeding. Indeed, "[t]here is no authority for the proposition that a party must be a party to the litigation for the absolute litigation privilege to apply." *Gorman-Dahm v. BMO Harris Bank, N.A.*, 2018 IL App (2d) 170082, ¶ 34.

¶ 48 Janet also asserts that defendant offered no evidence that its employees were part of defendant's "control group," which precludes the protection of the absolute litigation privilege. Under the attorney-client privilege doctrine, for the privilege to apply "a corporate claimant must show that the statement was made by someone in the corporate 'control group.' " *Claxton v. Thackston*, 201 Ill. App. 3d 232, 235 (1990). An employee is considered in the "control group" when "(1) the employee is in an advisory role to top management, such that the top management would normally not make a decision in the employee's particular area of expertise without the employee's advice or opinion; and (2) that opinion does in fact form the basis of the final decision by those with actual authority." *Archer Daniels Midland Co. v. Koppers Co.*, 138 Ill. App. 3d 276, 279 (1985). However, Janet has not cited any authority to support that the control group rule, which applies to attorney-client privilege, should also apply to the absolute litigation privilege. Thus, we disagree with Janet's argument that defendant's employees are not protected by the absolute litigation privilege because defendant did not show that they were part of defendant's control group.

¶ 49                                                   III. CONCLUSION

¶ 50 In sum, the absolute litigation privilege applies to defendant's statements and conduct, and plaintiff's IIED claim was properly dismissed. For the reasons explained above, we affirm the circuit court's judgment.

¶ 51 Affirmed.

- 11 -